633 So.2d 1319 (1994)
Deborah A. HUTZLER and Terry L. Hutzler,
v.
Martha H. COLE, Allstate Insurance Company, State of Louisiana, Department of Transportation and Development, East Feliciana Parish School Board, Lilla W. Gilbert, and Citicorp Acceptance Corporation.
No. 93 CA 0486.
Court of Appeal of Louisiana, First Circuit.
March 11, 1994.
*1321 Larry M. Roedel, Baton Rouge, for plaintiffs-appellants Deborah Hutzler and Terry Hutzler.
Leah H. McKay, Baton Rouge, for intervenor-appellee Liberty Mut. Ins. Co.
Brenda H. Verbois, Baton Rouge, for defendant-appellee State of La., DOTD.
Tim A. Tullos, Baton Rouge, for defendant-appellee State Farm Mut. Auto Ins. and Lynne Dehabermann.
*1322 Before CARTER, GONZALES and WHIPPLE, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment dismissing petitioners' wrongful death claims on a motion for involuntary dismissal.

FACTS
In 1990, Rachel Michelle ("Shelley") Hutzler was a seventeen-year-old senior at Zachary High School. Her brother, Thomas Patrick ("Tommy") Hutzler, was a fifteen-year-old sophomore at the same high school. On February 9, 1990, at approximately 7:20 a.m., Shelley was driving to school in a 1988 Nissan, owned by her mother Deborah Hutzler, and Tommy was a guest passenger in the automobile being driven by his sister. The Hutzler vehicle was proceeding south on La. Highway 964 near the intersection of La. Highway 964 and the Pride-Port Hudson Road.
At the same time, there was a line of northbound traffic approaching the same intersection. The first vehicle in the line of traffic was a 1989 Acura owned by Lesley A. England and operated by his wife, Rebecca J. England. The England vehicle was followed by a 1988 Chrysler owned and operated by Martha Cole. The third vehicle in the line of traffic was a 1986 Ford Aerostar Van, which was owned by Citicorp Acceptance Company (Citicorp) and operated by Lilla W. Gilbert. The fourth and final automobile in the northbound lane was a vehicle owned and operated by Lynne Dehabermann.
La. Highway 964 is a very narrow, two-lane state highway with little or no shoulder. Along most areas of La. Highway 964 where it intersects with the Pride-Port Hudson Road, the shoulders on both sides of the highway vary in width from one to three feet wide and are primarily made of grass and soil. Additionally, the shoulders of the roadway are bordered by three to four foot deep drainage ditches. The speed limit for the area near the intersection with the Pride-Port Hudson Road is 55 mph. The area around the curve near the intersection is marked with double yellow lines in both directions, signifying a no passing zone.
As the Hutzler vehicle negotiated the curve in La. Highway 964, Cole left her lane of travel and attempted to pass the England vehicle. At the same time, Dehabermann left her lane of travel and attempted to pass the Gilbert and England vehicles. The Hutzler and Cole vehicles came in close proximity before the Cole vehicle successfully completed its passing maneuver and moved quickly into its own lane of travel. When faced with the Cole vehicle in her lane of travel, Shelley applied her brakes in an effort to avoid colliding with the Cole vehicle. When she did, the Hutzler vehicle began to slide to the left and across the center line of La. Highway 964, striking the left side of the England vehicle and thereafter proceeding out of control into the northbound lane of travel, where it was struck by the Gilbert vehicle. There was no impact between the Hutzler and Dehabermann vehicles. However, as a result of the accident, both Shelley and Tommy were killed.
On August 15, 1990, petitioners, Deborah A. Hutzler and Terry L. Hutzler, filed the instant suit for damages for the wrongful death of both of their children. Named as defendants were: Cole and her automobile liability insurer, Allstate Insurance Company;[1] East Feliciana Parish School Board, Cole's employer;[2] the State of Louisiana, Department of Transportation and Development (Department); Gilbert;[3] and Citicorp, *1323 owner of the Gilbert vehicle.[4] Thereafter, petitioners amended their petition to name as additional defendants, Dehabermann and her liability insurer, State Farm Insurance Company.
The parties filed various pleadings. Fidelity Fire & Casualty Insurance Company, Hutzler's automobile collision insurer, intervened in the proceedings for reimbursement for the collision damage to the Hutzler vehicle. Gilbert filed a petition of intervention on behalf of her minor son, seeking recovery for the injuries he sustained as a result of the accident.[5] Liberty Mutual Insurance Company, uninsured/underinsured motorist insurer of the petitioners filed a petition of intervention, seeking subrogation to the petitioners' rights against the other defendants.[6]
Pursuant to a joint motion filed by the remaining parties, namely, petitioners, the Department, State Farm, Dehabermann,[7] and Liberty Mutual, the trial court ordered that the issue of liability be tried separately from the issue of damages. Thereafter, petitioners and Liberty Mutual entered into a stipulation in which the parties agreed to delay their dispute on the intervention claim until there was a determination on the issue of damages in petitioners' favor and a damage award.
The matter proceeded to trial of the merits on the issue of liability against the only remaining defendant, the Department. At the close of petitioners' case, the Department moved for a involuntary dismissal pursuant to LSA-C.C.P. art. 1672. The trial judge took the matter under advisement, and, after the close of defendant's case, for oral reasons, granted the Department's motion for involuntary dismissal and dismissed petitioners' claims against the Department with prejudice at petitioners' cost.[8]
From this adverse judgment, petitioners appeal, assigning as error the trial court's dismissal of petitioners' action pursuant to LSA-C.C.P. art. 1672.

INVOLUNTARY DISMISSAL
Petitioners contend that the trial court erred in granting the involuntary dismissal.
LSA-C.C.P. art. 1672 B provides as follows:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
In a non-jury case, the appropriate standard for the trial court's determination of a motion to dismiss is whether the plaintiff has presented sufficient evidence on his case-in-chief to establish his claim by a preponderance of the evidence. Shafer v. State, Department of Transportation and Development, 590 So.2d 639, 642 (La.App. 3rd Cir. 1991); Brown v. E.A. Conway Memorial Hospital, 588 So.2d 1295, 1298 (La.App. 2nd Cir.1991). In making its determination on such a motion, the trial court is not required to review the evidence in the light most *1324 favorable to the plaintiff as is done when a motion for directed verdict is filed in a jury case. Shafer v. State, Department of Transportation and Development, 590 So.2d at 642. Unlike the motion for a directed verdict in a jury trial, a motion for involuntary dismissal pursuant to LSA-C.C.P. art. 1672 B requires a judge to evaluate the evidence and render a decision based upon a preponderance of the evidence without any special inferences in favor of the opponent to the motion. Barnes v. Thames, 578 So.2d 1155, 1164 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991); Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366, 369 (La.App. 2nd Cir.1988). In other words, on a motion for involuntary dismissal, the trial judge is only required to weigh and evaluate all of the evidence presented up to that point and grant a dismissal if the plaintiff has failed to establish his claim by a preponderance of the evidence. Shafer v. State, Department of Transportation and Development, 590 So.2d at 642.
Proof by a preponderance of the evidence simply means that, taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not. Barnes v. Thames, 578 So.2d at 1164; Fuller v. Wal-Mart Stores, Inc., 519 So.2d at 369. Although petitioners are not entitled to any special inferences in their favor, absent circumstances in the record casting suspicion on the reliability of the testimony and sound reasons for its rejection, uncontroverted evidence should be taken as true to establish a fact for which it is offered. Fuller v. Wal-Mart Stores, Inc., 519 So.2d at 369.
A dismissal based on LSA-C.C.P. art. 1672 B should not be reversed in the absence of manifest error. Shafer v. State, Department of Transportation and Development, 590 So.2d at 642. For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The issue to be resolved is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony as well, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850, 853 (La. 1990).
Moreover, where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883. However, where the documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, an appellate court may find manifest error or clear wrongness even in a credibility determination. Rosell v. ESCO, 549 So.2d at 844-45.
In the instant case, in granting the judgment of dismissal, the trial judge based his decision entirely on a finding that the petitioners failed to establish that the condition of the shoulders caused the accident. Because the trial judge determined that petitioners failed to establish one of the integral requirements under the duty-risk analysis, *1325 he granted the motion for involuntary dismissal and dismissed petitioners' action.
In a typical negligence case against the owner of a thing which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Kent v. Gulf States Utilities Company, 418 So.2d 493, 497 (La.1982). Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm. Kent v. Gulf States Utilities Company, 418 So.2d at 497.
In analyzing petitioners' claim for ordinary negligence on the part of the Department, the standard analysis we employ is the duty-risk analysis, which requires proof of five separate elements:
1. Proof that the defendant had a duty to conform his conduct to a specific standard (the duty element);
2. Proof that the defendant's conduct failed to conform to the appropriate standard (the breach element);
3. Proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);
4. Proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and
5. Proof of actual damages (the damages element).
Fowler v. Roberts, 556 So.2d 1, 4 (La.1989); McKeen Homeowners Association, Inc. v. Oliver, 586 So.2d 679, 681 (La.App. 2nd Cir. 1991). See Roberts v. Benoit, 605 So.2d 1032, 1041 (La.1991); Mart v. Hill, 505 So.2d at 1122.

A. CAUSE IN FACT.
The initial inquiry is whether any causal relationship exists between the harm suffered by plaintiffs and the defendant's alleged negligent conduct. Thus, if plaintiffs can show that they probably would not have suffered the injuries complained of but for the defendant's conduct, they have carried their burden of proof relative to cause in fact. Chapman v. Gulf Insurance Company, 425 So.2d 277, 282 (La.App. 3rd Cir.1982), writ denied, 432 So.2d 268 (La.1983). Cause in fact is generally a "but for" inquiry; if the plaintiffs probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause in fact. Roberts v. Benoit, 605 So.2d at 1042. In other words, the inquiry is whether the defendant contributed to the plaintiffs' harm. An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the "substantial factor" test. Fowler v. Roberts, 556 So.2d at 5, n. 6. Under this test, cause in fact is found to exist when the defendant's conduct was a "substantial factor" in bringing about plaintiffs' harm. Roberts v. Benoit, 605 So.2d at 1042.
Under either method, it is irrelevant in determining cause in fact whether the defendant's actions were "lawful, unlawful, intentional, unintentional, negligent, or non-negligent." Roberts v. Benoit, 605 So.2d at 1042. Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerationsmorality, culpability, or responsibilityinvolved in the duty-risk analysis. Roberts v. Benoit, 605 So.2d at 1042.
When multiple causes are present, defendant's conduct is a cause in fact when it is a factor generating plaintiffs' harm. Rick v. State of Louisiana, Department of Transportation and Development, 93-1776 c/w 93-1784 (La.1994), 630 So.2d 1271. Direct or circumstantial evidence constitutes a preponderance when it shows that causation is more probable than not. The question of whether the defendant's conduct is a cause in fact is a factual inquiry to be determined by the trier of fact, be it judge or jury. See Rick v. State of Louisiana, Department of Transportation and Development, *1326 93-1776 c/w 93-1784, p. 8, 630 So.2d at 1275. See also Fowler v. Roberts, 556 So.2d at 6; McKeen Homeowners Association, Inc. v. Oliver, 586 So.2d at 682-83.
In support of their claim for damages, petitioners presented the testimony of numerous witnesses who testified about the factual incidents before, during, and after the accident, including the testimony of Deborah Hutzler, Lesley and Rebecca England, Lilla Gilbert, Martha Cole, and the police officers who investigated the accident. Petitioners also presented the testimony of numerous officials from the Department, including Ted Stockwell, Lacey Glascock, and Thomas Buckley, who testified regarding the condition of La. Highway 964 and the measures the Department undertook to maintain the highway, as well as the notice the Department had regarding the condition of the highway. Petitioners also presented the testimony of area officials to testify as to the notice the Department had regarding the dangerous condition of the highway, including the mayor, the chief of police, and a state legislator. Finally, petitioner presented the testimony of two expert witnesses.
Petitioner, Deborah Hutzler, the thirty-nine-year-old mother of the deceased children, testified that she and her children resided approximately 4.3 miles from the accident site. According to Hutzler, at the posted speed limit, it takes approximately 6-½ minutes to get from her front door to the accident site. Hutzler testified that the school her children attended was 7.8 miles from their home and that the trip took approximately nine minutes.
Hutzler testified that she and her children were very familiar with La. Highway 964 in that they drove the roadway on a daily basis. Shelley drove to school daily along that roadway. Hutzler testified that, on prior occasions while her daughter was operating the vehicle, she was present in the vehicle when an emergency occurred in their lane of travel. In this situation, Shelley applied her brakes and veered to the right, avoiding a collision.
Hutzler testified that she had given Shelley safety instructions concerning travelling along La. Highway 964. Hutzler cautioned her daughter regarding speed, especially along the curves of the highway. Hutzler related that there had been several accidents involving children along the highway, so that each time an accident occurred, she alerted her children to the dangers.
Hutzler testified that school usually commenced at 7:30 each morning. On the morning of the accident, Hutzler testified that Shelley and Tommy departed at about 7:08 a.m. Moreover, Hutzler testified that, on the evening preceding the accident, it had rained most of the evening. When the children departed for school, the streets were wet, and there was a little mist falling.
Lesley England testified that he and his wife were travelling north on La. Highway 964 on the morning of the accident. England described the highway as a two-lane highway with virtually no shoulder. England testified that, on each side of the roadway, there is approximately one foot of shoulder, consisting of asphalt, then there is a strip of grass and dirt, followed by a ditch which varies in depth from three to four feet and is a few feet wide. The posted speed limit in the area is 55 mph. England also noted that there is a no-passing zone prior to reaching the intersection with the Pride-Port Hudson Road, which is denoted by a "No Passing Zone" sign and yellow striping in the center of the roadway.
England testified that, on the morning of the accident, he and his wife were travelling north on La. Highway 964. At the time, he was a passenger in the automobile driven by his wife. His vehicle was the first in the line of traffic. As their vehicle approached the intersection with the Pride-Port Hudson Road, his wife made a remark about the maneuver made by another driver. When England looked up, he observed a light grey Chrysler (the Cole vehicle) pass and then cut in front of their vehicle. At the time of the passing maneuver, the Cole vehicle was in the no passing zone. England estimated that his wife was travelling approximately 50 mph at the time. As a result, England determined that the Cole vehicle was travelling in excess of 50 mph.
At the time of the passing maneuver by the driver of the Chrysler, England observed *1327 a small red automobile (the Hutzler vehicle) coming around the curve in the southbound lane of travel. When England observed the Hutzler vehicle in the southbound lane, the Cole vehicle was still occupying the southbound lane of travel and had not yet completed its passing maneuver. England estimated that only two to three seconds elapsed between the time he observed the Hutzler vehicle and the time the Cole vehicle completed its passing maneuver and returned to the northbound lane of travel, and that only two to three car lengths remained between the two vehicles.
England observed the Hutzler vehicle negotiate the curve and felt that the vehicle executed the curve normally and did not appear to be speeding, although England could not assign a numerical speed to the Hutzler vehicle. England testified that, as the Hutzler vehicle approached his automobile, the Hutzler vehicle began to slide across the roadway, striking the rear door and rear quarter panel of his automobile. Moments after the impact with his vehicle, England heard a crash behind him. England estimated that only four to five seconds elapsed between the time he first observed the Hutzler vehicle and the time he heard the crash behind him.
After the accident, England's wife stopped their vehicle, and he exited the vehicle and proceeded to the scene of the accident. England first encountered the Ford van (the Gilbert vehicle), which was facing south, but located in the northbound lane. He then observed the Hutzler vehicle in the ditch along the right hand side of the roadway. Neither occupant of the Hutzler vehicle was moving.
England's wife, Rebecca, testified that she recalled that the posted speed limit for La. Highway 964 is 45 mph. She described the shoulders of the highway along that area as nonexistent, but noted that there may be a foot of grass. Mrs. England also noted that each side of the highway has a ditch. Mrs. England also testified that, near the intersection of La. Highway 964 and the Pride-Port Hudson Road, there is a no-passing zone, which is signified by a sign.
While driving on the morning of the accident, Mrs. England was proceeding at approximately 50 to 55 mph. She observed a grey or light-colored Chrysler vehicle (the Cole vehicle) pass her vehicle and commented to her husband "What's that crazy lady doing?" She estimated the speed of the Cole vehicle to be in excess of 50 mph to 55 mph. At that point, Mrs. England noticed the Hutzler vehicle proceed around the curve in the southbound lane. Although Mrs. England did not know the exact speed at which the Hutzler vehicle was travelling, she did not observe anything unusual about the operation of the Hutzler vehicle and did not believe it was speeding. As the Cole vehicle returned to the northbound lane after completing its passing maneuver, Mrs. England observed the Hutzler vehicle begin to slide across the roadway. At that time, there were only a couple of car lengths between the Chrysler and the Hutzler vehicle, and Mrs. England believed that the two vehicles might collide. Thereafter, the Hutzler vehicle continued to slide and struck the rear of her vehicle and subsequently collided with the vehicle behind hers.
Mrs. England testified that the driver of the Cole vehicle did not stop, but proceeded travelling north. After the collision, she pulled her vehicle to the side of the roadway and exited her vehicle. Mrs. England went to the accident site, where she observed the van completely turned around and the Hutzler vehicle in the ditch.
Lilla Gilbert testified that on the morning of February 9, 1990, she was driving a Ford Aerostar van (the Gilbert vehicle) north on La. Highway 964. Gilbert testified that it was raining that morning. Gilbert received injuries as a result of the accident and remembers little or nothing regarding the accident.
Martha Cole testified that, in February of 1990, she was a resident of Baton Rouge, but was employed by the East Feliciana Parish School Board and that she taught kindergarten in Jackson. As a result, each day she travelled from Baton Rouge to Jackson via La. Highway 964. Cole testified that on the morning of February 9, 1990, as she was proceeding north on La. Highway 964, she *1328 was in a line of traffic. As Cole was approaching the intersection with the Pride-Port Hudson Road, she attempted to leave her lane of travel to determine whether it was safe to execute a passing maneuver. When she left the northbound lane to pass the vehicle in front of her, Cole observed the Hutzler vehicle coming around the curve in the southbound lane of travel. However, according to Cole, the Gilbert vehicle behind her moved up, and she was unable to return to her lane of travel. As a result, she attempted to complete her passing maneuver. Cole did not believe that she was speeding when she executed her passing maneuver. Cole testified that she was attempting to pass the vehicle in front of hers because she wanted to get to a gas station and still arrive at school timely. Cole noted that she was experiencing trouble with her vehicle in that it had been stopping on her and she wanted to add some gas to her vehicle.
Cole testified that, although she exited her lane prior to being in the no-passing zone, by the time she executed her passing maneuver, she was in the no-passing zone. Cole testified that, during the passing maneuver, she observed the Hutzler vehicle slow somewhat, which helped enable her to complete the maneuver without colliding with the Hutzler vehicle.
Sergeant Keith Robinson, Uniform Supervisor with the Zachary City Police Department, was in charge of investigating the automobile accident involving petitioners' children and the other motorists. Robinson testified that he was dispatched at 7:22 a.m. on the morning of February 9, 1990, and arrived at the scene at 7:30 a.m. Numerous law enforcement personnel, including other members of the Zachary City Police Department and a state trooper, assisted with the investigation. Robinson testified that it is normal procedure to obtain assistance from the state police when fatalities are involved in an accident.
According to Robinson, the shoulders of La. Highway 964 near the intersection with the Pride-Port Hudson Road are made of gravel and dirt. The shoulders along that stretch of highway are three to four feet in width and adjacent to the shoulders are drainage ditches, which vary in width from six to eight feet and vary in depth from two to four feet. Robinson also testified that the pavement drops off approximately five to seven inches along that area. The posted speed limit for the highway, which includes both sides of the intersection with the Pride-Port Hudson Road, is 55 mph.
Robinson testified that, when he arrived on the accident scene, there was no physical evidence on the roadway. Robinson explained that there were no scuff or skid marks because of the wet pavement conditions. As a result, he was unable to determine the point of impact. Robinson testified that, because of the extensive damage to both vehicles and the debris, which was all over the roadway and stretched to the final resting place of the Hutzler vehicle, he was unable to determine the precise point of impact. Nor could Robinson determine the movement of the vehicles after the impact. Robinson testified that there was no physical evidence that the Hutzler vehicle had attempted to go to the shoulder on the west side of La. Highway 964 or, having attempted to drive onto the shoulder to avoid the collision, encountered difficulty getting back onto the highway. In describing the position of the vehicles after the impact, Robinson testified that the Gilbert vehicle was on the east shoulder, facing a southern to southwesterly direction. The Hutzler vehicle was in the east drainage ditch, facing north. Robinson further testified that Cole was cited for passing in a no passing zone and for hit-and-run driving.
Dane K. Morgan, patrolman with the Louisiana State Police, assisted Sergeant Robinson with the accident investigation. Morgan testified that, in a major accident involving major injuries and property damage, it is normal procedure for the state police to assist with accident investigation. Upon his arrival, Morgan prepared the diagram of the final resting places of the vehicles. In describing the weather conditions on the morning of the accident, Morgan testified that, if it was not raining when he arrived, it had just stopped, and the pavement was very wet. Because of the condition of the pavement, Morgan was not able to obtain any *1329 skid mark data, nor were any gouge marks detectable. Although Morgan observed some scuffing on the east shoulder of the road, he was unable to determine the point of impact between the Gilbert and Hutzler vehicles primarily because of the lack of physical evidence. Although there was debris scattered throughout the vicinity of the accident scene, he was unable to determine the final resting place of the debris. Morgan explained that, by the time he arrived on the scene, more than fifty people were present, including emergency services personnel, fire department officials, and others. As a result, the accident scene had been compromised in that some of the physical evidence had been moved, making it difficult to determine a definite point of impact.
Ted Stockwell, the highway needs, priorities, and programs engineer for the Department, admitted that La. Highway 964 is part of the state highway system, which is maintained by the Department. Stockwell testified that roadways are characterized by a functional classification, which denotes how important the roadway is to the travelling public. He further testified that La. Highway 964 is classified as a rural collector road, which is the lowest functional classification.
Stockwell explained that the "minimum design standard" is a measure for the construction of an improvement once the improvement is accepted into the highway construction program. However, the "minimum tolerable condition" is a lesser standard that is used solely for developing the needs study to develop a priority list. Stockwell noted that, although a highway may be deficient in a couple of fields of data, if the overall sufficiency of the highway is high, an improvement would not be recommended. However, Stockwell admitted that a two foot shoulder would not meet either the minimum design standards or minimum tolerable conditions.
Stockwell testified that the minimum tolerable shoulder width is four feet. If a roadway had a shoulder of less than four feet in width, it would fall below the Department's own benchmark for establishing deficiencies.
Stockwell testified that, in assessing whether a highway is deficient, the Department looks at the amount of traffic utilizing the highway, number of lanes, roadway width, shoulder width, and other similar items. Stockwell testified that the Department performs an annual needs study. In preparing for this study, the Department dispatches one of its employees to record data on the roadways. Stockwell testified relative to the needs study performed by the Department on La. Highway 964 during 1989. In discussing the 1989 survey, Stockwell stated that for shoulder width, La. Highway 964 scored a two out of five, which meant that the roadway had a two-foot to three-foot shoulder. The design speed for the roadway in the area was 70 mph, and the average daily volume of traffic was 5,449 vehicles. However, Stockwell testified that the portion of La. Highway 964 near the accident site had a total sufficiency rating of eighty-two out of 100 and a total condition rating of thirty-seven. The safety rating for that section of highway was fifteen, which borders between good and fair. Stockwell testified that overall the pertinent section of La. Highway 964 was good and was in the upper 25% of highways statewide. Moreover, Stockwell admitted that the volume of traffic on the pertinent portion of La. Highway 964 increased from 1,690 in 1968 to 5,449 in 1989.
Stockwell testified that two major factors influence whether a roadway is put into the preliminary proposed construction program. First, regardless of how deficient the roadway, the Department must look at the funding available. Second, the Department looks at minimum tolerable conditions. Stockwell testified that, if faced with a choice of placing a roadway with a poor surface or one with a good surface into the program, the Department utilizes the remaining useful life out of the good roadway and places the one with a poor surface condition into the program first. With regard to the priority of funding, Stockwell testified that the first priority is given to programs which would be matched with federal dollars, in which the federal government will provide 80% to 90% of the funding with state matching funds of 20% and 10%, respectively.
Stockwell acknowledged that many of the roads in Louisiana have numerous deficiencies. *1330 He also acknowledged that La. Highway 964 is deficient with regard to the surface width and the shoulders. However, it takes between five and seven years for a roadway to go through all of the preconstruction activities for complete reconstruction. According to Stockwell, under today's standards, the width of the two-lane riding surface would have to be increased to twenty-four feet and the width of each shoulder must be eight to ten feet. Stockwell testified that the total cost of bringing this particular roadway to today's standards would cost between $500,000.00 and $600,000.00 per mile. Moreover, Stockwell noted that 20% of the state's 16,600 miles of roads, or approximately 2,900 miles, are in poor condition. About 5,100 miles of the state roadways are in fair condition, according to Stockwell. As a result, the Department attempts to resurface the less deficient roadways so that it can utilize the available funds for reconstruction of the more deficient state highways.
Lacey A. Glascock, deputy secretary of the Department at the time of trial, testified that in setting standards for speed, the Department measures the speed at or below which 85% of the vehicles measured travel, which is known as the 85th percentile method. This is done by performing statistical sampling of highway speed of a certain number of drivers or a specified length of time. In discussing the 85th percentile concept, Glascock explained that the method is used to determine the speed at which 85% of the motorists determine is reasonable and prudent for the conditions. The 85th percentile concept is based on the notion that speed limits below the 85th percentile do not facilitate the orderly movement of traffic, cannot be enforced effectively, and are not voluntarily observed by motorists. Glascock acknowledged that the 85th percentile method is not the only factor used to establish speed limits; the condition of the shoulder is also a factor considered in establishing speed limits. If the shoulder of a roadway is poor, the speed measured by the 85th percentile would be lowered in setting the speed limit for a given section of the highway. However, Glascock also noted that, despite the posted speed limit, drivers should adjust their speeds to account for weather conditions.
Glascock testified relative to correspondence the Department received from the state police requesting the reduction of the speed limit on La. Highway 964. However, he had no recollection of any response to that request by the Department. Glascock also testified regarding a letter received from a Zachary resident relative to the speed limit on La. Highway 964 and the placement of curve warning signs 1.2 miles south of La. Highway 64. According to Glascock, he advised the Zachary resident that the Department could not honor her request for modification of the 55 mph speed limit. Glascock also acknowledged receipt of a letter from a Baton Rouge resident requesting the reduction of the speed limit on La. Highway 964. Despite these and other requests, the Department did not take any action to reduce the speed limit on La. Highway 964.
Glascock also testified regarding the signing of highways as "substandard." Glascock stated that at one time there was a movement within the Department to shield itself from liability by labeling roadways as substandard. However, that program was abandoned after a few years.
Thomas J. Buckley, district traffic operations engineer for District 61 for the Department, testified that La. Highway 964 is included in District 61. According to Buckley, speed limits are based generally upon road surface characteristics, shoulder conditions, grade alignment and sight distance, the 85th and 50th percentile speed and the pace speed, roadside development and culture and roadside friction, safe speeds for curves or hazardous locations, parking practices, and pedestrian activity. Buckley noted that the deficiency of a roadway and the adequacy of the shoulder are considerations in setting speed limits. He also acknowledged receipt of correspondence from area residents, the Zachary mayor, and police departments about the condition of La. Highway 964 with regard to speed limit, signing, line markings, shoulder width, lane width, etc. Buckley also noted that, in an area north of the accident site located in East Feliciana Parish, the speed limit of La. Highway 964 was lowered from 55 mph to 45 mph. However, Buckley *1331 stated that the Department does not use these type of complaints to establish speed limits, but utilizes an engineering directive standards manual.
Buckley also testified regarding a 1987 speed study conducted on La. Highway 964 approximately 1.6 miles north of La. Highway 64. According to Buckley, the 85th percentile speed was 59 mph and the pace speed was 50 mph to 60 mph. The engineering directives suggest that the speed limit be set as close to the 85th percentile as possible. Because the posted speed limit was below the 85th percentile, Buckley testified that more than 85% of the vehicles on the roadway at that location were exceeding the speed limit. According to Buckley, attempting to lower the speed limit below 55 mph would create more problems than it would solve. Buckley stated that, in essence, the 1987 study revealed that it would not be a wise decision to lower the posted speed limit. Buckley testified that the 85th percentile was not the only criteria he used to determine the appropriate speed limit; roadway width, shoulder width, and other factors played a part in his engineering judgment in setting the speed limit at 55 mph. However, Buckley acknowledged that, although his report indicates that the roadway is twenty feet wide at the point of the 1987 study, he was unaware of the minimum design width for a two-lane rural roadway and the minimum tolerable conditions for the roadway.
James R. Clary, Sr. was accepted by the court as an expert in civil engineering, land surveying, highway safety, design, and signing, and traffic engineering and testified on behalf of the petitioners. Clary prepared a plan at the accident site at the intersection of La. Highway 964 and the Pride-Port Hudson Road, which was introduced into evidence as P-31. According to Clary, the pavement is twenty feet wide in this area, and each lane is ten feet in width in this area. The width of the shoulder on the west side of the highway varied from two to four feet. However, on the east of the highway, the shoulder varied in width from two to three feet.
Clary also performed horizontal and vertical measurements at various stations along La. Highway 964 near its intersection with the Pride-Port Hudson Road, which were introduced into evidence as P-31-A. According to Clary, the paved portions of the lanes of travel are ten feet wide, and the width of the shoulder along the southbound lane of travel varies from two to four feet. The shoulder areas are narrow and are comprised mostly of grass, although at one time they may have been stabilized aggregate. Clary testified that the ditch slopes in the area are generally in the 3-to-1 or better range, which are considered by the American Association of State Highway and Transportation Officials (AASHTO)[9] manual as being non-recoverable slopes.
Clary reviewed the Department design records and standards as applied to La. Highway 964. He also reviewed the construction records for that highway from the date of its construction to the present. Clary testified that La. Highway 964 did not meet the design standards published by AASHTO since 1940. Clary explained that the highway is deficient or below standard with regard to the shoulder width and fore slope of the ditch. Clary testified that the highway is not in compliance with the 1946 standards in that the width of the shoulders is deficient. The highway was also deficient with regard to the 1955 standards in that the pavement width, shoulder width, and ditch slopes were deficient. The highway was also deficient with regard to the 1962 and 1966 standards in that the lane widths, shoulder widths, and, in some cases, ditch slopes, were deficient. Nor did La. Highway 964 meet the AASHTO design standards for 1968, 1969, 1971, 1973, 1975, 1985, 1986, or 1988. Clary opined that La. Highway 964 has been out of compliance with and below the minimum design standards since at least 1940. However, Clary acknowledged that, because the highway was constructed in 1916, the Department did not have an affirmative duty to bring all state highways in compliance with the 1946 design standard. Clary further acknowledged that *1332 the Department did not have the obligation to bring all roads and highways up to current standards.
Clary noted that a project is classified as "reconstruction" when the distance from the top of the ditch slope to the top of the ditch slope is altered, when the base is removed and replaced, or when a new embankment has been built where the alignment is changed. On the other hand, Clary defined an "overlay" as an overlay of an existing project or in which the base or the width of the embankment is not altered. Clary acknowledged that, of the seven projects the Department undertook between 1940 and 1985, he did not know how many, if any, were reconstruction projects.
Clary also discussed the difference between minimum design standards and minimum tolerable conditions. According to Clary, when the Department makes its annual inventory of all of the roads to prepare a highway needs summary, it uses a pamphlet entitled highway needs priorities. Clary acknowledged that highway needs summaries are used by the Department to rank its roadways to prepare a proposed highways construction program for submission to the legislature; they are not used as a standard for reconstruction. However, Clary testified that, within the highway needs priorities, there are another set of standards which have nothing to do with date of construction or any particular date. Clary testified that minimum tolerable conditions are a benchmark below which the Department considers critically deficient. Clary further testified that although La. Highway 964 is a rural collector road, no matter into which category that highway is placed, it fell below the Department's minimum tolerable conditions for both lane and shoulder width in 1974. Clary further testified that this roadway should be brought up to minimum tolerable conditions and that, based upon his review of the Department's records, internally, the Department recognizes that La. Highway 964 is deficient.
Clary also testified with regard to the 1990 needs survey relative to the section of the La. Highway 964 where the accident occurred. According to Clary, given lane and shoulder width, an average daily traffic count of 5,449 with a design year average daily traffic count of 8,931, an average speed of 70 mph, and a peak hour operating speed of 51 mph, the time period for the deficiency was "now." However, the recommended type of improvement was "no improvement." Clary also observed that the needs survey reveals that the most heavily travelled areas along La. Highway 964, including the area near the accident site, are the most narrow. Clary acknowledged that the 1990 needs study of that section of La. Highway 964 rated the roadway eighty-two out of 100, which is a good overall rating; however, Clary qualified this statement by noting that, given the Department's assessment of the roadway, the Department had obviously not gone out and actually inspected the roadway.
Clary admitted that surface rating, which is the smoothness factor, for that section of the highway in the 1990 needs survey was fourteen, which is at the high end of a fair rating and is almost good. Clary acknowledged that, based upon the Department's calculations, there may be as many as 16,470 miles of roadway within the state highway system, approximately 4,000 miles of which has a poor rating for surface smoothness.
When discussing the financial burden of bringing all of the roadways up to current standards, Clary noted that the surface width and shoulder width, according to cost ratio dollars spent, has one of the highest benefits for dollars spent. However, Clary acknowledged that AASHTO recognizes that it is unfeasible to include every recommendation or design value into every future highway project and that engineering judgment would be required to make a determination of the extent of the improvement which can be reasonably made with the limited resources available.
Clary also testified regarding the construction history of the section of La. Highway 964 where the accident occurred. According to Clary, the first project on the highway was a gravel reconditioning which took place in 1916. Thereafter, after 1940 numerous new asphalt paving and pavement rehabilitation work was performed on La. Highway 964.
*1333 According to Clary, the Department performed an annual inventory of the roads under its jurisdiction in 1968. At that time, for the general condition of the highway, the section of the highway near the accident site rated a thirty-five on a scale of forty. With regard to shoulder width, the Department rated this section of La. Highway 964 a zero on a scale of eight. The average daily traffic volume was 1,690, and the design speed was 60 mph.
Clary also explained that in 1990 the average highway speed along the pertinent section of La. Highway 964 was 70, but that the speed limit was 55, and the design speed was 60. Clary testified that this meant that the average speed was above the design speed for the highway.
Clary also examined the number of accidents on La. Highway 964 within a ten-year period. Clary observed that, within a one mile stretch on each side of the intersection with the Pride-Port Hudson Road, there had been approximately 129 accidents registered in the state records and an additional thirty-six accidents in the Zachary records. These numbers included numerous "run off the road" accidents; however, Clary had no information as to the circumstances surrounding each of these accidents. Clary opined that the large number of accidents in the area over the ten-year period indicated that the highway lacked what he referred to as a "clear roadside recovery area." Clary explained that a "clear roadside recovery area" is an unencumbered section of the roadway outside the paved area that allows a vehicle, for whatever reason, to leave the roadway. If this unencumbered area is available, then, under the AASHTO statistics, 80% of the vehicles leaving the paved surface will recover the paved surface without accident.
Clary was of the opinion that the section of La. Highway 964 where the fatal automobile accident occurred was below the minimum tolerable standard. From an engineering perspective, the greatest problem is the lack of uniformity throughout the length of highway. Clary explained that, in the more lightly travelled portion of the roadway, the road is wider while, in the more heavily travelled portion of the roadway, which includes the accident site, the paved width is two feet smaller. Clary testified that the section of La. Highway 964 where the accident occurred does not provide for a margin of error or margin of safety in an emergency situation.
In looking at the physical dimensions, Clary testified that the Hutzler vehicle was 66.1 inches wide. If La. Highway 964 had met the 1940 design standards on the date of the accident, the entire width of the embankment would have been thirty feet and would have consisted of two 11-foot lanes with a minimum of two four-foot shoulders. As a result, there would have been an additional foot of paving on the west side of the highway and six foot more of shoulder for a total of seven extra feet. The same would have been true of the east side of the highway. Given the physical dimensions of the location, namely a ten-foot lane and a two-foot shoulder, Clary opined that, if an emergency situation arose because of the presence of an automobile in the center of the lane, there would be no room for a motorist to avoid a collision.
Joseph H. Andre, an expert in the field of accident reconstruction and analysis, testified on behalf of petitioners. On April 9, 1990, Andre performed an initial assessment of the accident scene. After his initial assessment, he returned to the site on two separate occasions. Andre also studied the photographs of the accident scene taken by the district attorney's office. According to Andre, the photographs depict the final resting places of the Hutzler and Gilbert vehicles, the debris, and the damage to the respective vehicles. Andre also took some of his own photographs which depicted the north and south vantage point of La. Highway 964 and the damage to both vehicles. Andre also reviewed the police report, the police photographs, Department accident summaries, reports of other accidents in the area, the report of Joseph Blaschae,[10] the report of Jim Clary, the depositions *1334 of various witnesses,[11] and a drawing prepared by Clary.
Andre testified as to how, in his estimation, the accident began to unfold. According to Andre, using the intersection with the Pride-Port Hudson Road as a reference point, the Cole vehicle began to pass the England vehicle near the shell driveway south of the reference point and returned to its lane after completing the passing maneuver in the area of the Pride-Port Hudson Road. At the point at which the Cole vehicle returned to its lane, the Hutzler vehicle, which had rounded the curve north of the intersection, began to slide. The vehicles were moving the entire time, and the left front fender of the Hutzler vehicle impacted with the left rear side of the England vehicle. At that point, the Hutzler vehicle was partially out of control and was continuing to travel south to the point of impact with the Gilbert vehicle. The Hutzler vehicle spun in a clockwise direction and ended in the ditch east of La. Highway 964, facing the opposite direction. The Gilbert vehicle spun clockwise, more or less in place, and the rear of the vehicle moved forward slightly. Although Andre could not be positive about the precise point of impact because of all of the activity in the general area, he opined that it was somewhere near the front end of the Gilbert vehicle. Andre testified that this location was the most likely point of impact because the shoulder of the highway was damaged in that area. Additionally, the debris on the side of the roadway correlated with his determination of the point of impact.
Andre testified that, based upon his study, Gilbert had an opportunity, as did the Englands, to see what was transpiring in front of her. According to Andre, Gilbert should have been able to observe the Cole vehicle execute its passing maneuver as well as the close encounter with the Hutzler vehicle. As a result, Gilbert would have had an opportunity to reactslow her vehicle and pull to the right. Andre testified that Gilbert should have been able to slow her vehicle five to ten miles an hour prior to the impact, which would have made her speed between 35 and 45 at the time of impact. Andre testified that Gilbert's expected course of action would have been to slow her vehicle and pull to the right of the highway, which could have aided in the clockwise spinning of the Gilbert vehicle when it came in contact with the Hutzler vehicle.
However, Andre testified that a number of variables, including driver reaction from point of commencement of skidding, impact with England vehicle, impact with Gilbert vehicle, steering input, braking, and other such factors, made it difficult to calculate the speed of the Hutzler vehicle. However, Andre had no evidence to suggest that Shelley Hutzler was exceeding the speed limit, and he noted that the Englands both testified that they observed nothing unusual with the speed of the Hutzler vehicle. Assuming Hutzler was travelling at the posted speed limit of 55 mph, Andre testified that Shelley Hutzler's reaction time would have been eighty-one feet per second. Andre estimated that, given a 1.5 second reaction time, at the posted speed, the Hutzler vehicle would have travelled 120 feet, which would have been at the point where the Hutzler vehicle neared the Pride-Port Hudson intersection. Moreover, even assuming that Shelley Hutzler was exceeding the posted speed limit, Andre testified that the speed of the Hutzler vehicle was not a factor in this case. However, Andre acknowledged that, given the wet condition of the roadway, if Shelley Hutzler was travelling too fast for the conditions of the roadway, such action would have contributed to the loss of control of her vehicle. Andre concluded that, given the available two-foot shoulder at the Pride-Port Hudson intersection, from an accident reconstruction standpoint, Shelley Hutzler had no available option but to slow her vehicle.
Andre testified that the factors which contributed to the accident included the action of Cole executing a passing maneuver in a "no passing" zone and the lack of a margin of error or margin of safety on the roadway because of the lack of adequate shoulders. *1335 Andre testified that the accident was initiated by the actions of Cole in executing the passing maneuver, which was the primary cause of the accident. But Andre attributed Shelley Hutzler's loss of control of her vehicle to the actions of Cole, her initial reactions in steering to the right and braking, and the lack of enough area to maneuver her vehicle to take evasive action. However, Andre agreed that, once the Hutzler vehicle was out of control, Shelley would have been unable to maneuver to the shoulder. Andre also agreed that Gilbert was partially at fault. Andre based this conclusion on the fact that Gilbert had ample opportunity to observe what was taking place in front of her, but that she failed to react properly. Furthermore, Andre testified that, based upon certain testimony that the Dehabermann vehicle was also attempting a passing maneuver in the "no passing" lane about the same time the Cole vehicle was executing its passing maneuver, Dehabermann's action also contributed to the accident. However, Andre testified that, in his opinion, Shelley Hutzler did not overreact to the circumstances with which she was confronted or commit any driving error that contributed to the accident.
John A. Womack, Mayor of the City of Zachary, testified by deposition. Womack testified that La. Highway 964 runs through the western edge of Zachary. Womack explained that, although La. Highway 964 is maintained by the Department, during his tenure as mayor, he has received numerous complaints about La. Highway 964 from the citizens in the area. The majority of the complaints he received after 1980 concerned the narrowness of the road, the speed limits, and the related safety associated with the limitations of the road. Womack testified that, as mayor, he made complaints to the Department and testified before a joint legislative committee regarding the condition of La. Highway 964. In fact, in 1981 following the death of area residents along La. Highway 964, Womack wrote a letter to the then Secretary of the Department requesting improvements to the highway. Thereafter, in 1987, Womack again wrote to the Department advising them of the extremely hazardous condition of La. Highway 964 and suggested that, because of the substandard nature of the highway, the speed limit should be lowered from 55 mph to 45 mph, and the center line in the area be marked with double yellow lines. Then in 1991, the mayor signed a resolution requesting improvements to La. Highway 964 in that the conditions of the roadway were rapidly deteriorating, resulting in more than one accident per week.
Bates Browning, the Zachary Chief of Police testified that in 1989, the Zachary City Police Department handled a total of thirty-six accidents along La. Highway 964. During his tenure as chief of police, the condition of La. Highway 964 had been in the same condition, and the Department did not take any steps to widen the road or to improve the shoulders along La. Highway 964. According to Browning, subsequent to the February 9, 1990, accident, he personally met with Department officials to discuss his concerns regarding La. Highway 964, specifically the speed limit and the general dangerous condition of the highway. At that time, Department officials agreed to double stripe portions of the highway and to lower the speed limit. With regard to efforts to widen the roadway, Department officials informed Bates that they would include the highway in the five-year plan in which they would widen the roadway and bring it up to standard.
John D. Travis, state representative for District 62, testified that a portion of La. Highway 964 lies within his district. Travis testified that he is personally familiar with La. Highway 964 in that he drives on the highway daily. However, Travis's testimony was met by objection as to relevance. The trial judge sustained the objection, but permitted petitioners to proffer Travis's testimony. However, petitioners did not appeal from the trial judge's ruling on the admissibility of this testimony. Therefore, his proffered testimony is not properly before us and cannot be considered in reviewing the trial court judgment.
After reviewing the entire record in this matter, we must reluctantly conclude that the trial court was not manifestly erroneous in finding that the petitioners failed to prove that any negligence on the part of the Department *1336 caused petitioners' damages. The evidence reveals that the actions of nearly all of the drivers, except England, contributed to the accident. Cole was attempting to execute a passing maneuver in a "no passing" lane. Gilbert may have pulled behind the England vehicle after the Cole vehicle left the northbound lane of travel and precluded Cole from reentering. Moreover, Gilbert failed to see what was unfolding before her and take the necessary actions to avoid the collision. Dehabermann also attempted to execute a passing maneuver in a "no passing" zone. Shelley Hutzler may have been travelling too fast for the weather conditions. Although the evidence also shows that the roadway was narrow and had little or no shoulder, the trier of fact obviously determined that, given the actions of the other parties, the Department's actions did not cause this accident.
In recent cases, the Louisiana Supreme Court and the appellate court were confronted with similar or analogous facts as those of the instant case. In both cases, on review, the courts affirmed the trial court findings of causation. In Rick v. State of Louisiana, Department of Transportation and Development, 630 So.2d at 1275, the Department contended that its failure to upgrade the railroad crossing was not a cause in fact of Rick's death, In analyzing whether the conduct of the Department caused Rick's death, the court noted:
According to witnesses, Mrs. Rick was driving in a cautious and careful manner. She stopped at the stop sign. Presumably, she would have acted with greater caution if there had been flashing lights and a gate. If a gate had been present and lowered, there is a presumption that she would have acted with due regard for her own safety and remained stopped behind the gate.
After slowly crossing the first set of railroad tracks, Mrs. Rick was in a position of peril as she approached the second set of tracks. She was concentrating on the rough surface of the crossing and either did not see or could not avoid the approaching train. Because of her slow progress and the hole in the crossing, it is more probable than not that her small vehicle stalled on the second set of tracks. It is impossible to say that the trier of fact was clearly wrong in finding that the condition of the crossing and the absence of active signals were causes in fact of her death.
In Gerald Simpson v. State of Louisiana through the Department of Transportation and Development, 629 So.2d 468 (La.App. 1st Cir.1993), 92 CA 0115, 0116, three young men received substantial injuries when the truck in which they were riding went out of control and hit the railing of a trestle bridge. On appeal, the Department argued that the condition of the bridge, however defective, was not a cause of the driver's losing control of his vehicle. In Simpson, the trial court determined that the Department was negligent for not repairing the bridge and in not eliminating an unreasonably dangerous condition and that the defective bridge caused the injuries. In affirming the trial court determination in this regard, this court noted that the actions of the driver and the inaction of the Department combined to cause the event.
In the instant case, the trier of fact determined that the actions of the Department were not the cause of the unfortunate eventthe collisions of the Hutzler vehicle with the England and Gilbert vehicles. We note that, if this court were the trier of fact, we would very likely have reached a different factual determination with regard to causation. However, upon review our function is not to determine whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. See Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though we may feel that our own evaluations and inferences are more reasonable than the fact finder's, we cannot disturb reasonable evaluations of credibility and reasonable inferences of fact where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Moreover, where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart v. State, Department *1337 of Transportation and Development, 617 So.2d at 883.
In Lirette v. State Farm Insurance Company, 563 So.2d at 852-53, the Louisiana Supreme Court, in reversing an appellate court decision on the issue of causation, stated:
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. (Citations omitted).
The Louisiana Supreme Court emphasized the appellate court's error in improperly conducting a de novo finding of fact in disregarding portions of the testimony and concluding that the jury was manifestly erroneous in rejecting part of the testimony.
As such, we cannot say that the trial judge was manifestly erroneous in granting the Department's motion for involuntary dismissal upon finding, as a factual matter, that the automobile accident was not caused by the actions of the Department.

CONCLUSION
For the above reasons, the judgment of the trial court, granting the Department's motion for involuntary dismissal, is affirmed. Petitioners are cast for all costs on appeal.
AFFIRMED.
GONZALES, J., concurs, and assigns reasons.
GONZALES, Judge, concurring.
I agree with the result, but concur with the analysis. We do not need to consider an alternative method for determining cause in fact (the substantial factor test used herein) when the facts do pass the but-for analysis. But-for the conditions of the road shoulder, would the same accident have resulted? The answer is yes; therefore, the condition of the shoulder was not a factor in causing this accident. That is the end of the causation inquiry. See Dissent in Gerald Simpson v. State of Louisiana Through the Department of Transportation and Development, CA 92 0115 c/w CA 92 0116 c/w CA 92 0117, 1993 WL 651455 (La.App. 1st Cir.1993).
As pointed out by noted legal authority David W. Robertson, in his law review article in progress, Exploring Cause in Fact, University of Texas, (Dec. 11, 1992):
Sometimes courts say that the test for cause in fact is the substantial factor test and then proceed to define the substantial factor test as identical to the but-for test. Such phrasing is commonplace and by itself is not particularly confusing. But why introduce a new term (substantial factor) into the cause-in-fact discussion and then promptly define the new term as adding nothing new? (Footnote deleted.)
The majority in the case sub judice finds "When multiple causes are present, defendant's conduct is a cause in fact when it is a factor generating plaintiff's harm," citing Rick v. State of Louisiana, Department of Transportation and Development (La.1994), 630 So.2d 1271. (Emphasis added.) The Rick case cites three other cases for this statement: Forest v. State, Louisiana Department of Transportation and Development, 493 So.2d 563 (La.1986); Vicknair v. Hibernia Building Corp., 479 So.2d 904 (La. 1985); and Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). However, the term "factor generating" is not found in the Forest, Vicknair *1338 or Dixie cases. The court in Dixie Drive It Yourself stated:
Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. Under the circumstances of this case, the negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it. A cause-in-fact is a necessary antecedent. If these collision would have occurred irrespective of the negligence of the driver of the RC Cola truck, then his negligence was not a substantial factor or cause-in-fact. (Emphasis added, footnote deleted.)
137 So.2d at 302.
The Forest court found "[a] public authority is liable in solido with a motorist when its negligence, combined with that of a motorist, is found to be the cause of the accident." 493 So.2d at 571. The Vicknair court used the term "precipitating factor" in finding that a fire alarm incident contributed to the premature delivery of plaintiff's baby. 479 So.2d at 909. The Vicknair court further found "[w]hen the actionable negligence of two tortfeasors contributes in causing harm to a third party, each of them is responsible for the damage. They are solidarily liable." 479 So.2d at 910.
The term "factor generating," as used by the majority in the case sub judice and the Louisiana Supreme Court in Rick, appears to be a new name for cause in fact. The definition of "generate" is (1) to produce (offspring); beget; procreate, (2) to bring into being; cause to be, (3) to originate or produce by a physical or chemical process. Webster's New World Dictionary, (2d College Ed.1982).
Before we determine whether or not factor generating is some new test for causation, we must look to the causation analysis used by the Louisiana Supreme Court in Rick.
According to witnesses, Mrs. Rick was driving in a cautious and careful manner. She stopped at the stop sign. Presumably, she would have acted with greater caution if there had been flashing lights and a gate. If a gate had been present and lowered, there is a presumption that she would have acted with due regard for her own safety and remained stopped behind the gate.
Rick, 630 So.2d at 1275.
The use of the phrase "she would have acted with greater caution if there had been flashing lights and a gate" is the traditional theoretical substitution of the facts to remove the alleged negligence and determine whether the accident would have occurred in its absence. This is traditional but-for causation. See Dissent in Simpson.
By using the words "factor generating" the Louisiana Supreme Court has again, as Professor Robertson points out, come up with new words but no new analysis. One must simply ignore the words and focus on the analysis to determine whether there has been a change from the traditional but-for analysis for causation.
NOTES
[1] Pursuant to a summary judgment, dated June 7, 1991, petitioners' claims against Cole and Allstate were dismissed. Shortly after the accident. Cole had filed for bankruptcy, which extinguished any obligation she may have had to petitioners.
[2] By judgment of voluntary dismissal, dated March 22, 1991, petitioners voluntarily dismissed the East Feliciana Parish School Board.
[3] By judgment, dated February 14, 1992, petitioners settled their claims and causes of action with Gilbert and dismissed her from the suit. Petitioners specifically reserved their rights against the remaining defendants, namely the State, Dehabermann, and State Farm.
[4] Pursuant to an exception pleading the objection of no cause of action, petitioners' claims against Citicorp were dismissed by judgment dated December 10, 1991.
[5] Gilbert settled and compromised her son's claim, and, pursuant to a motion and order to dismiss, dated June 29, 1992, dismissed her petition of intervention.
[6] Liberty Mutual Insurance Company paid petitioners $50,000.00 for each child pursuant to its policy provisions. By motion and order to dismiss, dated July 9, 1992, Liberty Mutual dismissed Gilbert from its intervention claims.

Pursuant to a motion and order to dismiss, Liberty Mutual also dismissed State Farm from its intervention claims.
[7] Pursuant to motions to dismiss, filed by Liberty Mutual and petitioners, the main demand and intervention claims against Dehabermann were dismissed.
[8] In granting the Department's motion for involuntary dismissal, the trial judge considered only the petitioners' evidence.
[9] According to Clary, AASHTO is a national organization that publishes geometric design standards, sign standards, and marking standards for use by highway departments and municipal county officials throughout the United States.
[10] Joseph Blaschae was the Department's expert witness in the areas of highway design, traffic engineering, and accident reconstruction.
[11] According to Andre, he reviewed the deposition testimony of Martha Cole, Cole's son, Lesley and Rebecca England, Lynne Dehabermann, Lilla Gilbert, Sergeant Gregory Robinson, and Trooper Dane Morgan.