588 So.2d 1295 (1991)
Wardell BROWN, Plaintiff-Appellant,
v.
E.A. CONWAY MEMORIAL HOSPITAL through STATE of Louisiana, Defendant-Appellee.
No. 22945-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1991.
Guerriero & Guerriero by Jeffrey D. Guerriero, Monroe, for appellant.
Hayes, Harkey, Smith, Cascio & Mullens by Haynes L. Harkey, Jr., Monroe, for appellee.
Before MARVIN, LINDSAY and HIGHTOWER, JJ.
MARVIN, Chief Judge.
In this medical malpractice action arising out of the treatment of a stab wound, Brown appeals the dismissal of his demands on the defendant hospital's motion for involuntary dismissal that was granted *1296 by the trial court after the close of Brown's evidence in a bench trial. CCP Art. 1672 B.
The trial court granted the motion on the finding that Brown's evidence did not prove the emergency room physician, Dr. Balius, negligent. Dr. Balius was not a party defendant. Only the hospital, which owes to its patients a duty of care independent of that of the treating physician, was named as defendant. See Bossier v. DeSoto General Hosp., 442 So.2d 485 (La.App.2d Cir. 1983), writ denied.
Brown presented testimony that he and his parents showed the pocket knife with which Brown was stabbed to a hospital employee and told that employee that the blade of the knife had broken off during the fight in which Brown was stabbed. Dr. Balius said he was not told in hospital records or otherwise that the knife blade had broken during the stabbing and explained why he did not order an x-ray of Brown's shoulder where he was stabbed.
In ruling on the motion for involuntary dismissal, the trial court did not make any finding as to the credibility of Brown and his witnesses, whose testimony was uncontradicted. Only after Brown returned to the hospital several times over a two-month period following the stabbing, did another physician take an x-ray and discover the fragments of the knife blade in Brown's shoulder. After undergoing surgery, Brown brought the action against the hospital.
Finding that Brown presented a prima facie case that a hospital employee was told of the broken knife blade and negligently failed to report this fact to Dr. Balius or other appropriate personnel of the hospital, we reverse and render judgment denying the hospital's motion for involuntary dismissal. We remand to allow the trial on the merits to be concluded.

FACTS
The 19-year-old plaintiff was stabbed in the right shoulder during a fight near his home in Oak Grove on April 7, 1987. Brown's parents took him to the emergency room at E.A. Conway Hospital in Monroe. There he was treated by Dr. Balius after a nurse, Martha Baxter, took Brown's vital signs and a brief history, which she wrote on Brown's chart: "Was stabbed in right shoulder about 7:45 p.m. this evening," some 1-½ hours before Brown arrived at the hospital.
Dr. Balius testified that Brown told him he had been stabbed with a short-bladed "penknife." Dr. Balius said this was consistent with the size of the wound, which he described as "superficial" or "shallow" and about one centimeter, or a little less than ½ inch, long.
Brown had a full range of motion in his shoulder. Dr. Balius probed the wound with a swab, feeling and examining the area of Brown's back near the wound. Dr. Balius did not find any evidence of a foreign body under the skin. Dr. Balius did not take x-rays, explaining that he had no reason, from Brown's history or from his findings on examining the wound, to suspect that a foreign body was under Brown's skin.
Brown returned to the Conway emergency room for two follow-up visits on April 9 and April 15, 1987. He did not see Dr. Balius on these visits, but saw other ER staff doctors who found his wound slightly swollen, with no signs of infection, and found that he had a full range of motion in his shoulder. No x-rays were taken on these visits.
Brown went back to the Conway ER on June 15, 1987, because he still had pain and swelling in his shoulder. A staff doctor, Dr. Arbour, ordered an x-ray which showed that there were two fragments of a knife blade in Brown's shoulder. Dr. Balius was present in the ER and reviewed the x-ray with Dr. Arbour. Brown left the hospital without learning of the x-ray and returned there two days later, on June 17, 1987.
Dr. Balius then told Brown about the x-ray findings and instructed him to make an appointment with the surgical clinic at the hospital to remove the fragments. Instead, Brown saw a general surgeon in Bastrop, Dr. Reynolds. He found that Brown had pain and swelling in the area of a palpable nodule in his right shoulder and *1297 took x-rays that showed the two knife blade fragments. Dr. Reynolds removed one fragment but did not remove the other, which was not palpable and was not causing Brown any discomfort. Brown has had no further problems with his shoulder.
Brown testified that he was stabbed with a pocket knife that had two blades. He said one blade was broken off when he took the knife from the man who stabbed him and gave it to his father, Wardell Brown, Jr., after the fight. Brown and his parents testified that Brown's father brought the knife to the hospital and showed it to "a tall, brown-haired white man wearing green pants and a white coat" with hospital identification on it. They said this man took Brown's blood pressure before Brown saw Dr. Balius. Brown and his parents said they told this man, who was not identified by name in the record, that one of the blades had broken off during the fight and might still be in Brown's shoulder. Brown's father said the man looked at the knife and then returned it to him. Brown's father did not recall whether the man wrote anything down. Brown's father said he took the knife home and did not know where it was at the time of trial.
Brown's parents testified that the man they showed the knife to wore a white coat with the name of the hospital written on it, as well as a name tag with his own name on it. They did not know the man's name or what type of employee he was (doctor, nurse, etc.). They knew the man was not Dr. Balius.
Dr. Balius testified it was possible but very unlikely that the nurse who took Brown's history and vital signs was told about the broken knife blade but failed to write that information in Brown's chart. According to the chart, the nurse's name was Martha Baxter. Brown did not call Ms. Baxter, or other hospital employees on duty when he was initially treated, to testify.
Dr. Balius said he would have taken x-rays if Brown had been stabbed in the chest area, but said from the location of the wound on Brown's shoulder and from Brown's description of the weapon as a "short-bladed penknife" there was no possibility that the knife had punctured Brown's lung, damaged any other vital organs, or chipped a bone. Dr. Balius said he would have taken x-rays if he had known that the knife blade had broken off, but denied that anyone ever told him this, either directly or via the patient history in the chart. He explained that the x-rays would not necessarily have altered his treatment but would have been taken "just to find out if indeed there was something there."
Brown insisted that he did not use the term "penknife," but told the hospital employees he was stabbed with a pocket knife. Dr. Balius insisted that Brown did not use the term "pocket knife" and said Brown is the only patient he has seen, before or since, who reported being stabbed with a penknife.
The blade fragment that was removed from Brown's shoulder was 4.2 cm or about two inches long, 12 millimeters wide and 2 mm deep. Dr. Balius was asked why a fragment of this size was not detected when the wound was initially probed. He said it was possible that Brown's arm was extended when he was stabbed and that a layer of muscle covered the deeper parts of the wound when Brown was first examined.
Brown introduced the deposition of Dr. Reynolds, the general surgeon who removed the blade fragment. Dr. Reynolds testified that he would have taken x-rays if the patient had a stab wound to the chest, but said the reason for doing so would be to see if the knife had punctured any organs in the chest cavity, not to find foreign bodies. Dr. Reynolds said that if a patient had a stab wound to the shoulder, as Brown did, he "might not have taken an x-ray of the shoulder," explaining his belief that a physical examination would have been "more important" than x-rays to determine if any nerves or blood vessels were damaged.
Dr. Reynolds testified:
Q. If the history was given to you by this young man at the time immediately following the stabbing, that he had been stabbed and that there was a fear that *1298 the blade had broken off and gone into his shoulder, would it not be the appropriate standard of care to order an x-ray of that area?
A. Yes, but not because of breaking off of the blade, because of the possible hemo pneumothorax [blood or air in the chest cavity] that might be present.
Q. If you did take an x-ray at that point in time, just as you did in your case when you examined this young man, you would be able to ascertain from the x-ray if there was a foreign object. Is that not true?
A. Probably.
Q. And if there was a foreign object then it would be your duty and standard of care for the surgeons to notify the patient that there was a foreign object in that area....
A. Yeah. A piece of metal, I'd tell him there's a piece of metal, just like a bullet is still in them. You tell them the bullet is in them, but we don't go after the bullet and we don't go after the knife unless it's causing trouble.
Q. And if the person continued to complain with problems in that area then that would be one of the instances where it would be causing trouble and if it was able to be removed safely you would remove it, such as you did in this case?
A. Yes, sir.
Q. ... assuming that ... in this particular case this particular patient and/or his parents told the attending physician at [the] hospital that the bladethat they feared that the blade from the knife which was missing might very well be in his shoulderdo you think that the standard of care for the attending physician was to have ordered an x-ray?
A. Yes, sir.
On cross-examination, Dr. Reynolds testified that he did not know what the standard of care for an emergency room doctor would be. He then testified:
Q. ... if the stab wound had been in the shoulder it would not be your opinion that it would be a deviation of [sic] the standard of care expected of Dr. Balius not to take an x-ray. Is that right?
A. The only reason I could say if the family said that the blade broke off, if they give that history, then you might take an x-ray to say, well, "Yeah, there it is right there."
Q. If he gave the doctor that history?
A. Yeah, if he gave the doctor the history, the doctor might say, well, "Let's take an x-ray and see if it's inside."
Q. And if it was, you might or might not try to remove one or both?
A. Probably would not have tried to remove it at all. Just a note that it was there....
Q. I take it that you wouldn't remove them until the patient showed some distress or signs of discomfort as a result of the presence of the blades. Is that right?
A. That's correct.
At the close of Brown's evidence, the hospital moved for a judgment of involuntary dismissal under CCP Art. 1672 B, arguing that Brown failed to prove each of the three elements of a medical malpractice action against a physician under LRS 9:2794: 1) the applicable standard of care for the [emergency room] physician; 2) that any of the hospital physicians deviated from the standard of care; and 3) that the plaintiff suffered injuries that he would not have otherwise suffered as a result of the physician's deviation from the standard of care.

INVOLUNTARY DISMISSAL
At the close of the plaintiff's case, in an action tried by the court without a jury, the defendant may move for and the court may grant a judgment of involuntary dismissal on the ground that the plaintiff has shown no right to relief upon the facts, which the court may determine before ruling on the motion, and the law. CCP Art. 1672 B. The standard for granting the motion in a bench trial is whether the plaintiff has established his case by a preponderance of the evidence. Fussell v. Louisiana Bus. College of Monroe, 478 So.2d 652 (La.App.2d Cir.1985); Fuller v. Wal-Mart *1299 Stores, Inc., 519 So.2d 366 (La.App.2d Cir. 1988).
The trial court, citing Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974), correctly noted that a hospital has a duty to exercise that amount of care toward a patient that the patient's condition may require; that a determination whether that duty has been breached depends on the facts and circumstances of the case; and that a hospital may be held liable for the negligent conduct of all of its employees, including but not limited to nurses and staff doctors, committed while acting in the course and scope of their employment.
The trial court did not explicitly recognize that the hospital's duty under Hunt is independent of the physician's duty under LRS 9:2794 (see Bossier v. DeSoto General Hosp., cited supra), but said that the elements of proof in an action against a physician under § 2794 would apply to hospital employees other than physicians.
The trial court granted the hospital's motion on these findings:
The issue in this case is whether the emergency room doctors ... were first on notice, or informed, that ... the knife used in the stabbing was broken and that the broken portion may be inside the Plaintiff's shoulder. First, if you accept the Plaintiff's testimony and the corroborating witnesses that some individual, not Dr. Balius, was told of the ... possibility that the blade may be inside the Plaintiff, did that create any duty on the part of Dr. Balius or the hospital to take an x-ray of the shoulder or the upper scapula area or the thorax area?
Dr. Reynolds ... said that it's important to take an x-ray of the thoracic area to make certain that the knife has not penetrated the thoracic area. There is no evidence presented in this case today that shows that the thoracic area was penetrated by the knife wound. Dr. Reynolds also testified that he did not know what the standard of care for emergency room physicians was and he said it varies. ... He says for a stab wound in the posterior aspect of the right shoulder it is possible that he would not have taken an x-ray. It would have been a judgment call of the physician after a thorough physical exam to decide whether to take chest x-rays if [the wound was] in the shoulder area though he said ... it's not as important to take x-rays of the shoulder as it would be of the chest....
Dr. Balius testified that he was not told about a broken blade, he was only told about a knife. He testified that he was told that the Plaintiff had been stabbed with a short bladed penknife, that this was consistent with the depth that he probed the wound with a swab ... [and] regardless of whether you call it a penknife or what, he felt that if it was a short bladed knife as was indicated to him, that... there was no danger of a lung puncture....
There has been no showing in this case that Dr. Balius deviated from whatever standard of care he is bound to. Even in a close situation ... it was a judgment call and Dr. Balius exercised, in the Court's opinion, his best professional opinion and decision in this case.
[Paragraphs supplied.]

DISCUSSION
The trial court did not squarely find as a fact, as it could have under CCP Art. 1672 B, either that the Browns did or did not tell the unnamed male hospital employee that the knife blade had broken off during the fight and might be in Brown's shoulder. The court apparently concluded that Dr. Balius did not know of the broken blade and, therefore, was not negligent in his treatment of Brown. We neither agree nor disagree with this finding at this juncture.
Brown, however, presented evidence that he told another hospital employee about the broken knife blade. Brown also presented testimony from Drs. Balius and Reynolds that they would have taken x-rays had they known of the broken blade, even with the wound being in the shoulder area rather than the chest area. While both doctors testified that the blade fragments would *1300 not necessarily have been removed immediately, they agreed that they would have taken x-rays to verify that the fragments were in Brown's shoulder.
Dr. Reynolds described the physician's duty to tell the patient about the fragments, even though they would not be removed until they caused the patient distress or discomfort. One of the two fragments in Brown's shoulder did cause such symptoms during three months following the stabbing. The symptoms abated after that fragment was surgically removed by Dr. Reynolds.
From this evidence, it is reasonable to infer that the possibility that the knife blade had broken off in Brown's shoulder was a significant part of the patient history that should have been charted by the employee to whom Brown and his parents said they reported it. If the treating doctors had learned of the presence of the fragments by taking x-rays, Brown's symptoms could have been monitored and treated. Under the case-by-case analysis for determining a hospital's duty and breach of duty recognized in Hunt v. Bogalusa Community Medical Center, supra, we must find that Brown made a prima facie case of negligence against the hospital, and that the trial court erred in dismissing the action without hearing the hospital's evidence in its defense. See and compare Fussell v. Louisiana Bus. College of Monroe and Fuller v. Wal-Mart Stores, Inc., both cited supra.

DECREE
We reverse the judgment of dismissal, remand for further trial proceedings, and assess costs of the appeal to the hospital.
REVERSED AND REMANDED.