778 So.2d 33 (2000)
Pamela HOFFMAN
v.
EAST JEFFERSON GENERAL HOSPITAL, et al.
No. 00-CA-1216.
Court of Appeal of Louisiana, Fifth Circuit.
December 13, 2000.
Writ Denied March 16, 2001.
*34 Sidney J. Hardy, Catherine M. Williams, Campbell, McCranie, Sistrunk, Anzelmo & Hardy, Metairie, LA, Attorneys for Defendant/Appellant.
Jacob J. Amato, Jr., Nicole Loup Hackett, Gretna, LA, Attorneys for Plaintiffs/Appellees.
Panel composed of Judges GOTHARD, CANNELLA, JJ., and GAUDIN, J. Pro Tempore.
GOTHARD, Judge.
This is a medical malpractice action in which judgment was rendered in favor of the plaintiff after a trial on the merits. The judgment also awarded plaintiff a total of $395,000 in damages. Defendant, East Jefferson Hospital, appeals.
The petition for damages which initiated this action alleges that plaintiff, Pamela Hoffman, was admitted to East Jefferson Hospital (East Jefferson) on the morning of July 7, 1995 for two surgical procedures. She was scheduled to undergo a hysteroscopy with endometrial ablation under the care of Dr. Thomas Kennedy and, while under the anesthesia, a laparoscopic cholecystostomy to be performed by Dr. Charles Chappuis. The first procedure was performed vaginally and the second was abdominal. After both procedures were performed, Mrs. Hoffman was brought to the recovery room. Upon admittance into that unit, nurses noticed blisters on the buttocks. She was later released with instructions to put medicinal cream on the blistered area and use a compress of water and vinegar solution.
After discharge from the hospital, Mrs. Hoffman returned to Dr. Kennedy's office and was advised to continue the same treatment to care for the burns. However, the burns did not heal and Mrs. Hoffman was admitted to West Jefferson Hospital where she was treated for third degree burns. Mrs. Hoffman had to undergo surgical debridement and, subsequently, skin grafts. She was hospitalized for about two weeks following those procedures.
Mrs. Hoffman filed this action for malpractice after a medical review panel found no deviation from standard procedure by *35 either the doctors or the hospital staff. The petition names Dr. Kennedy and East Jefferson as defendants. After a four day bench trial on the merits, the court took the matter under advisement. Subsequently, the court rendered a judgment, supported by extensive written reasons, which found both defendants liable to plaintiff. The judgment also awarded damages as follows:

past, present and future physical pain &
suffering $330,000
past, present and future medical expenses $ 50,000
past, present and future mental anguish $ 15,000
 ________
Total $395,000

Although both defendants appealed, only East Jefferson has filed a brief with this court.
At trial the court heard testimony from Tina Hendrick, a nurse at East Jefferson, who testified that she knew both the plaintiff and Dr. Kennedy. Dr. Kennedy had delivered her baby, and Ms. Hendrick had assisted the doctor in surgery in the course of her employment with East Jefferson. Ms. Hendrick stated that she has known Mrs. Hoffman since 1987.
Ms. Hendrick was in the operating room during Mrs. Hoffman's surgery. Two other nurses, Kelly Jenkins and Natalie Walker, were also part of the surgical team. Ms. Hendrick explained that, during the procedure which Dr. Kennedy performed, the patient was put in stirrups, prepped and draped and a weighted speculum was inserted before surgery. Ms. Hendrick described the weighted speculum as having a large metal ball on the bottom half which weighs down the vagina after insertion.
After the surgery Ms. Hendrick noticed that the patient's skin was peeling at the crack of her buttocks. This condition did not exist prior to the surgery when the patient was prepped. Ms. Hendrick called Dr. Kennedy back into the room but he stated he did not know what caused the peeling. There was an electrical device used on the patient's uterus during the surgery, but it did not come into contact with the buttocks.
Ms. Hendrick explained that the normal procedure is to sterilize the surgical instruments in an autoclave set at 273 degrees for seven to ten minutes before bringing them into the operating room and placing them on a sterile table to cool. Ms. Hendrick did not know how long the instruments were in the room before their use by Dr. Kennedy. In this case Ms. Hendrick poured some saline solution over the speculum to cool it.
In Ms. Hendrick's opinion it was the speculum, which was insufficiently cooled, which caused the burns. However, she admitted that she did not touch the speculum and has no personal knowledge of the temperature of the device. Ms. Hendrick testified that she has seen some patients incur burns from Betadine, but never to the serious extent Mrs. Hoffman suffered.
Dr. Thomas Kennedy, one of the defendants, testified that he performed a hysteroscopic endometrial ablation to stop the patient's heavy vaginal bleeding. He explained the surgery requires no incisions and is done on an outpatient basis. Dr. Kennedy stated that he was in charge of the procedure, although there were other technicians and nurses present. All supplies and equipment, including the speculum, used in the surgery were supplied by East Jefferson. Dr. Kennedy stated that hospital nurses take care of sterilizing and cooling the instruments used in surgery. Normally when an instrument is handed to him it is sufficiently cooled. However, he feels it at both the neck and the bottom to see if it is too hot. If he decides it is too hot, he hands it back to the nurse who cools it. He did not recall if, in this particular case, the speculum was too hot.
Dr. Kennedy testified that the pattern of the burns suffered by Mrs. Hoffman approximated the location and size of the weighed ball on the speculum. Dr. Kennedy could offer no explanation for how the burns were incurred. He simply stated that on the day of surgery, the speculum he inserted into Mrs. Hoffman's vagina did not feel too hot. Dr. Kennedy suggested *36 the cause of the burns was a combination of factors which included the weighted speculum. He also stated that Mrs. Hoffman was sunburned, and Dr. Kennedy opined that the area between the buttocks could have been chafed and sensitive from perspiring. That factor coupled with the warm speculum and the Betadine could have produced the burn. Although, Dr. Kennedy could not state for sure what caused the injury.
When Ms. Hendrick called him back into the room, Dr. Kennedy saw some minor blistering. He ordered ice packs. Mrs. Hoffman came to Dr. Kennedy the following Monday morning for examination. At that time Dr. Kennedy stated that he was "flabbergasted" and "almost fell off the stool". He stated he "didn't know it was going to be anything like that." Dr. Kennedy found bilateral second degree burns on the buttocks in the area touched by the Betadine and the weighted speculum. His records indicate the blistered area was debrided and dermoplas spray was applied. Dr. Kennedy testified that he has never seen any such injury before or since.
Dr. Kennedy prescribed granulex spray and continued soaks with vinegar and water for as long as Mrs. Hoffman could stand the pain. Dr. Kennedy explained that the vinegar, while necessary for healing on such a burn, would be very painful which is why it must be diluted with water. He also prescribed Silvadene cream to heal the burned area. Dr. Kennedy treated Mrs. Hoffman for about two weeks for the burns. Dr. Kennedy also set up home health care for Mrs. Hoffman whose dressings needed to be changed three times a day.
Dr. Kennedy expressed concern and sorrow that the injury happened, but denied that any normal standard of care was breached. He stated that he considered the incident a "freak accident". He further explained that, while he is responsible for the patient's care and directs the nurses and technicians, the responsibility for this burn is "multi-factorial, with a lot of people having some responsibility."
Dr. Kennedy testified that he believed the standard of care would require an obstetrician/gynecologist to feel an instrument before using it to make sure it is not too hot. He uses standard latex gloves which are not very thick and is able to feel the temperature easily. He testified that the speculum, which was in place for five to seven minutes, was not too hot.
Dr. Kennedy stated that the speculum could not have been 140 degrees as would be required for the severity of the burns suffered by Mrs. Hoffman. The operating room works as a team and the nurse would never hand an instrument that hot to the doctor. However, as a general statement, Dr. Kennedy testified that if a doctor used a speculum which was too hot on a patient under general anesthetic that would be a violation of the standard of care.
In conclusion, Dr. Kennedy opined that the possible factors causing the burn were the speculum, the Betadine, and the compromised condition of the skin due to chaffing.
The plaintiff also testified at trial. She stated that, although she had been in the sun the weekend before the surgery, she had no problems with the skin on her buttocks when she went into the hospital. After the surgery, she began feeling burning sensations on her buttocks. Mrs. Hoffman remained hospitalized overnight and had no other complications from the surgery. A nurse attending Mrs. Hoffman noticed the burns when she came into the room the afternoon of the surgery to get Mrs. Hoffman out of bed and into the bathroom. No treatment was provided for the burns that night. The next morning the nurse on duty called Dr. Kennedy and he ordered Silvadene cream. Two days later, Mrs. Hoffman went to Dr. Kennedy's office. During the examination, Dr. Kennedy told Mrs. Hoffman that it may have been the speculum which caused the burn. Four days later, Mrs. Hoffman again went to Dr. Hoffman's office and was *37 told it may have been the Betadine which caused the burn. Mrs. Hoffman stated that she has had surgery prior to the one at issue herein and has never had a reaction to the Betadine before. During that visit, Dr. Kennedy peeled away the burned skin without anesthesia, causing pain. Dr. Kennedy prescribed Silvadene cream and Dermoplas spray, as well as vinegar and water soaks three times a day. Mrs. Hoffman testified that the vinegar and water soaks were very painful and she rarely was able to stand the pain for the recommended thirty minutes of the soak.
The pain got worse as time went by. Mrs. Hoffman was unable to get into a comfortable position to sleep. At the time of the surgery, Mrs. Hoffman's two children were five and three years old. Mrs. Hoffman was unable to care for them and had to rely on her mother and her mother-in-law for child care. Dr. Kennedy treated Mrs. Hoffman three times for the burns. The visits became progressively more painful. During the treatments, Dr. Kennedy used scissors to cut away the burned skin. The only anesthesia used was a topical spray.
Mrs. Kennedy explained her daily routine. In the morning and evening her husband would clean the wound and apply the Dermoplas. Then she would soak the burned area with the vinegar and water solution, after which the Silvadene cream would be applied, and the area was bandaged. A home health care nurse would come to Mrs. Hoffman's home during the day to perform the procedure.
Because the pain continued to intensify, Mrs. Hoffman sought treatment from a new doctor, who prescribed antibiotics and advised her to consult a burn specialist. On that recommendation, Mrs. Hoffman saw Dr. DiVincenti a few days later. Dr. DiVincenti recommended immediate hospitalization in West Jefferson Hospital's burn unit. However, because Mrs. Hoffman had to make provisions for the care of her children, she did not enter the hospital until two days later. The hospital stay exceeded two weeks. During that time she had special baths, debridement and skin grafts using healthy skin harvested from her thighs. These procedures were done in the operating room while Mrs. Hoffman was under general anesthesia. Mrs. Hoffman described a very painful two weeks during her hospital stay. She also incurred $39,767.14 in medical bills for the treatment of the burns.
Mrs. Hoffman testified the commute from her home in east Jefferson to the hospital in west Jefferson, along with the coordination of child care for the couples's two small children, was a tremendous burden on her husband. When Mrs. Hoffman was released from the hospital, she had difficulty ambulating and was unable to resume her normal activities. She had to use a wheelchair for shopping. Mrs. Hoffman testified that it was five to six months after she was released from the burn unit before she was able to walk for any amount of time. She stated that her energy level remained low well beyond the six month period.
At the time of the trial, which was four years after the surgery, Mrs. Hoffman was still unable to sit for long periods of time without pain. She can no longer ride her exercise bike. She is unable to go bike riding with her children as she did before the injury, and family trips are disrupted by her need to stop so often during travel. Further, she suffered with severe constipation which caused rectal bleeding, and bedsores.
Dr. Frank DiVincenti, a board certified surgeon who is an expert in treating burn patients, testified he first saw Mrs. Hoffman on July 20, 1995 on a referral from Dr. Romagaro. Mrs. Hoffman had vaginal surgery on July 7, 1995 and had incurred burns during the surgery. Dr. DiVincenti classified the burns as full thickness third degree burns which would require contact with something with a temperature of at least 140 degrees. Dr. DiVincenti described the burns as being very symmetrical *38 and unlikely to be chemical burns from the Betadine. Dr. DiVincenti stated that although electrical burns were still a possibility, in his opinion the burns were thermal rather than electrical. He further testified it was very possible the speculum could have caused the burns.
When Dr. DiVincenti first saw Mrs. Hoffman on July 20, 1995, he began wound treatment. On July 24, 1995 Dr. DiVincenti admitted Mrs. Hoffman to West Jefferson Hospital's burn unit to continue treatment. Dr. DiVincenti described the daily treatment for burn patients. He explained that twice a day the patient is scrubbed with a disinfectant soap and water and soaked in a tub for about thirty minutes. At that time the wounds are debrided by cutting away the dead tissue. It is a very painful procedure requiring some sedation.
While Mrs. Hoffman was hospitalized, she had a central line IV which is a catheter inserted into the jugular vein through which medication could be administered without causing irritation to the superficial veins of the arm. Mrs. Hoffman also suffered with constipation caused by the narcotics and the general discomfort experienced using the bathroom. On July 26, 1995, Mrs. Hoffman underwent debridement in the operating room under a general anesthetic in a one hour procedure which caused pain afterward. The daily treatments as described by Dr. DiVincenti were continued the next day. Mrs. Hoffman underwent a second surgery on July 28, 1995, after which the daily routines were continued. Dr. DiVincenti explained the purpose of the treatment was removal of all the dead tissue to allow healthy tissue to grow sufficient for grafting.
Following the second debridement surgery, Mrs. Hoffman had skin graft surgery. In that procedure, a thin layer of skin was removed from the hip area and applied to the burn areas. Dr. DiVincenti testified that both the donor site and the burn site took about ten to fifteen days to heal. The doctor testified that both sites would be painful for about five to ten days after the surgery. Mrs. Hoffman was released from the hospital on August 7, 1995.
Dr. DiVincenti testified that skin grafts need careful attention following discharge from the hospital since they can be easily separated from the wound. In Mrs. Hoffman's case the healing was complicated by the fact that the affected area was so near the anus. Mrs. Hoffman had to soak and carefully clean the area after bowel movements to avoid fecal contamination.
Dr. DiVincenti stated the treatments were eventually successful and she was discharged from his care on November 21, 1995. He did not expect that future surgery or treatment would be required. As to residual effects of the burn, Dr. DiVincenti explained the skin graft is thinner and more sensitive than the normal skin so Mrs. Hoffman would experience discomfort with prolonged sitting.
Mrs. Hoffman's husband, Donald, testified at trial. He said that after surgery on July 7, 1995 his wife complained of a burning sensation on her buttocks. He first realized there was a real problem about ten o'clock that night when the duty nurse attempted to get Mrs. Hoffman out of bed to go to the bathroom. Mr. Hoffman stated he did not realize the severity of the injury until July 10th when his wife went to Dr. Kennedy's office. When he came home from work and began the treatment ordered by the doctor, he then saw the extent and severity of the injury. Mrs. Hoffman was unable to sit or lie on her stomach, consequently she had to spend her time lying on her side. Mr. Hoffman had full responsibility for the couple's two young children and managed to provide for his family with the help of his mother and mother-in-law.
Mr. Hoffman explained that in caring for his wife he put vinegar and water compresses on her wounds, a very painful ordeal for his wife. He had to encourage her to keep the compress on as long as possible, while Mrs. Hoffman buried her *39 head in a pillow and screamed. Removing the bandages was also a painful time for Mrs. Hoffman because even when removed with great care, they would stick to the wound in some places.
During the two weeks Mrs. Hoffman was in the hospital, Mr. Hoffman had to coordinate child care and job responsibilities. He was required to get special permission from his employer to suspend his out-of-town travel. Mr. Hoffman executed an agreement to reimburse his employer for medical expenses incurred because of the injuries sustained in the first surgery.
Mr. Hoffman described the apprehensiveness of his wife and children during the two week treatment at West Jefferson Hospital as considerable. Currently, Mrs. Hoffman has healed but is uncomfortable sitting for long periods and is uncomfortable with the scars which remain from the skin grafts. Mr. Hoffman testified that the couple was unable to engage in sexual relations for about six months. Further, during the six months of treatment, the Hoffmans missed a planned family vacation and many family gatherings.
The defense presented evidence from Judy Bauer, the administrative director of surgical services for East Jefferson, who testified she investigated the incident in which Mrs. Hoffman was injured. She stated that Dr. Kennedy approached her and reported that one of his patients had been burned by a speculum during surgery. In the normal course of her investigation, Mrs. Bauer analyzed all possibilities such as electrical, chemical and thermal causes for the injury. The electrical equipment used in this case was removed and checked for malfunctioning. It proved to be functioning normally and was returned to use in the operating room. Ms. Bauer interviewed all individuals involved in the surgical procedure to determine if the burn could have been caused by an allergic reaction to Betadine. Ms. Bauer testified that in her experience she has seen patients exhibit such a reaction. However, in such cases the irritation to the skin is topical.
The third possibility considered was a thermal burn cause. Ms. Bauer stated that the instruments used in this procedure were flash sterilized in an autoclave which works under the three principles of time, temperature and pressure. The temperature in the autoclave reaches 270 degrees. Efforts used to cool the instruments before use include sterile saline applied directly to the instrument. Frequently the instruments are placed in the operating room to cool, a fact which is well known by doctors using them.
Ms. Bauer stated the hospital would sterilize the instruments and provide the means for cool down. Further, it would be the responsibility of hospital employees to communicate the status of the equipment to the doctor, but that the final decision as to when to use the equipment is the responsibility of the doctor. Ms. Bauer stated that hospital staff would convey to the doctor his or her judgment of whether the instrument was sufficiently cooled down before the doctor made the ultimate decision to use the instrument.
Ms. Bauer stated her investigation also revealed that a written report from Ms. Hendricks indicated a reddened area on the patient's buttocks between the two surgical procedures.
Kelly Jenkins, a certified surgical technician at East Jefferson testified her job is to gather surgical supplies and instruments for surgical cases. She is required to maintain a sterile field around the patient. Ms. Jenkins was the surgical technician on duty during Mrs. Hoffman's surgery. Ms. Jenkins stated the day was very busy at the hospital and the staff was required to work fast. She secured all of the instruments required for both of Mrs. Hoffman's surgeries. She noticed that some of the instruments necessary, including the speculum, were not on the shelf, so she ran to the instrument room to get them. She obtained the needed instruments *40 and put them in the autoclave for sterilization.
Because there were no instruments left on the shelf, a new set had to be sterilized. They were put in the autoclave for about ten minutes. Ms. Jenkins testified that someone else on the hall retrieved the instruments after the sterilization process and placed them in the operating room. Ms. Jenkins picked up the instruments she knew Dr. Kennedy would need and placed them on the table in a pan for cooling, and requested some cold saline. Ms. Hendricks later poured the saline over the instruments. Ms. Jenkins recalled that the instruments were just coming out of the autoclave as the patient was being wheeled in.
Ms. Jenkins testified that it is her responsibility to see that the instruments are cool enough to use on the patient, and to notify the operating doctor of the status of the instruments. In this case, the instruments were cooling about ten minutes before the surgical procedure was performed. During that period, Ms. Jenkins was setting up for both procedures and would periodically go back and "swish" the saline around in the pan to cool the instruments faster. She stated that she would not be able to tell the temperature of the speculum by feeling the saline solution in the pan. She also testified that it was the physician's duty to decide whether the instruments are sufficiently cooled to be used on the patient.
Ms. Jenkins testified that when Dr. Kennedy asked for the speculum, Ms. Jenkins picked it up by the lip and not the weighted ball. She told Dr. Kennedy at that time to check the temperature because it may still be too warm. Dr. Kennedy did not return the speculum to her for further cooling. His comment was that it would only be in for a few minutes. He took it from her by the neck and inserted it into Mrs. Hoffman. Ms. Jenkins testified she was standing next to Dr. Kennedy at the time.
Ms. Jenkins testified that Ms. Hoffman had a ground pad affixed to her left anterior thigh because the procedures required the use of electronic equipment. Ms. Jenkins testified Ms. Hoffman's legs were in stirrups for the first surgery, and the part of the buttocks which sustained the injury was not touching the table. For the second surgery, the bottom of the table which was dropped down for the gynecological procedure was put back up to make it level with the rest of the table. Then Ms. Hoffman's legs were removed from the stirrups and lowered onto the table.
Ms. Jenkins testified that, after the first surgery performed by Dr. Kennedy, she noticed a reddening of the buttocks in an area which corresponded with the location of the weighted ball on the speculum. There were no burns on the site of the grounding pad. Dr. Kennedy was notified of the burns on the buttocks.
Dr. Robert Deck, Jr., a board certified expert in obstetrics and gynecology who was a member of the medical review panel, testified he did not believe Dr. Kennedy breached the standard of care and that the wound was most likely electrical in origin because of its location. A grounding pad for electrical equipment used in the surgery was placed on the metal table near the patient.
He did not believe the burn was caused by the speculum because it was too far posterior. However, he admitted it was almost impossible to determine what happened when there is a bad result. Dr. Deck testified that if the weighted speculum was too hot and caused the injuries, it would be a breach of the standard of care.
Dr. James Bohn, an expert in obstetrics and gynecology who served on the review panel, also testified he did not believe Dr. Kennedy breached the standard of care because he would have felt the speculum if it were that hot. He did not offer an opinion on how Mrs. Hoffman sustained the injury.
*41 The third member of the medical review panel, Dr. Paul Fuselier, also testified. He agreed with his colleagues that there was no breach of the standard of care by Dr. Kennedy in this case. He opined the burns were electrical in nature. He believed that an arc was created when the patient's legs were put down after the surgery. He suggested that the pad was moved at that time and the equipment malfunctioned. He explained that if that happened, the metal table the patient was lying on would become a ground and the closest to the stainless steel table is the buttocks.
Both Dr. Kennedy and East Jefferson filed motions for appeal; however, only East Jefferson has filed a brief with this court. Therefore, we consider Dr. Kennedy's appeal abandoned.
In brief to this court, East Jefferson argues the plaintiff failed to show a breach of the standard of care which would impose liability on the hospital. East Jefferson does not disagree with the testimony that the standard of care in this case is to ensure that an instrument which is too hot is not used on a patient who is under general anesthesia, and that it is the responsibility of the professionals involved to make sure the instrument is cooled sufficiently. Rather, it maintains that the ultimate decision is made by the doctor and he is solely responsible for any breach of the standard of care which may have occurred. In support of its contention, East Jefferson argues the hospital discharged its duty to the patient when Ms. Jenkins instituted the cooling process and communicated to the doctor that the instrument needed to be checked for temperature. At that point it became the sole responsibility of the doctor to determine if the speculum is cool enough. If the temperature of the speculum caused the injury, East Jefferson argues Doctor Kennedy, who is not a hospital employee, is solely responsible.
Plaintiffs in a medical malpractice suit against a hospital have the burden of showing that the hospital personnel negligently departed from the recognized standard of care afforded by hospitals in the area for the particular malady involved. Jones v. Rapides General Hospital, 598 So.2d 619 (La.App. 3 Cir.1992); Dean v. Ochsner Medical Foundation Hosp. and Clinic, 99-466 (La.App. 5 Cir. 11/10/99), 749 So.2d 36. In the instant case, there is sufficient testimony to show that the use of an instrument before it is sufficiently cooled after sterilization is a breach of the standard of care both for hospital employees and the doctor performing the surgery. There is also testimony that it is the responsibility of all members of the surgical team, whether hospital employees or independent doctors, to make sure the instruments are cool. The hospital employees sterilized the equipment immediately before surgery. It is the testimony of Ms. Jenkins that she told the doctor to check the instruments for temperature. It is clear that there was some concern on her part that the speculum may be used too soon after sterilization. However, she testified that she only felt the neck of the speculum before informing Dr. Kennedy of the possible problem. We find the facts of this case support the trial court's finding that East Jefferson breached the standard of care by not testing the temperature of the speculum before it was used on plaintiff.
East Jefferson also argues the trial court erred in imposing strict liability on the hospital in this case and in finding the hospital vicariously liable for Dr. Kennedy's malpractice. We have reviewed the trial court's extensive reasons for judgment and do not find the trial court imposed strict liability on East Jefferson, or found the hospital vicariously liable. In those reasons the trial court stated:
The testimony and evidence at trial clearly indicate that the burns suffered by the plaintiff were in fact thermal burns which were caused by the weighted *42 speculum which was used by Dr. Kennedy during the procedure. Just prior to its use the spectrum had been sterilized in an autoclave at a temperature which exceeded two hundred degrees. According to one witness, it was removed from the autoclave and placed in a warm saline solution in order to cool prior to its use. Another witness testified that she handled the spectrum by its neck and suggested to Dr. Kennedy that he check to see if it wasn't too hot to use on the patient. She further testified that Dr. Kennedy also held the instrument by its neck and remarked that the speculum would only be placed inside the patient for a "few seconds." To the contrary the weighted speculum remained inside of the plaintiff and against her buttocks for a period of five to seven minutes.
The weighted speculum is an "S" shaped instrument in which the bulk of its weight and density is not in the neck of the instrument but rather at its base. It was the base of this instrument which rested against the plaintiff's buttocks during the procedure. It was also the base part of the weighted speculum which would have retained the highest degree of heat for the longest period once it was removed from the autoclave and subsequent saline solution. The failure of Dr. Kennedy and those employees of East Jefferson Hospital to ascertain that the instrument was indeed too hot and had not sufficiently cooled to be inserted into and up against the patient's buttocks clearly falls below the degree and level of skill and care that should have been exercised during the procedure. Dr. Kennedy, as well as the surgical staff assisting him, failed to use reasonable care and diligence, and also failed to use their best judgment in not allowing the instrument to cool sufficiently. No one checked to see if in fact the speculum was thoroughly cooled. Although there was some testimony that the burns could have possibly resulted from an electrical malfunction, a reaction to a betadyne (sic) solution, or even bedsores, the evidence clearly indicates that the overly hot weighted speculum caused the patient's injuries.
It is clear from those reasons that the trial court made factual findings consistent with the testimony offered at trial and ultimately found East Jefferson negligent in its treatment of this patient.
In the final assignment of error, East Jefferson argues alternatively that if it is found to be liable, the trial court erred in failing to apportion fault between the two defendants. We agree. LSA C.C.P. art 1917 provides, in pertinent part:
In nonjury cases to recover damages for injury, death or loss, whether or not requested to do so by a party, the court shall make specific findings that shall include those matters to which reference is made in Paragraph C of Article 1812 of this Code.
Two of the matters referenced in LSA C.C.P. article 1812 Paragraph C are the finding that fault was a legal cause of the injury and the degree of fault expressed in percentage. Here the trial court made the requisite finding that the actions of both East Jefferson and Dr. Kennedy constituted the legal cause of plaintiff's injury. However, the court did not make the requisite finding of the degree of fault.
The trial court's failure to assess percentages of fault is legal error. Boudreaux v. Farmer, 604 So.2d 641, 651 (La. App. 1st Cir.), writ denied, 605 So.2d 1373 & 1374 (La.1992); La.C.C.P. art.1917; La. C.C.P. art. 1812(C); Turner v. D'Amico, 96-0624 (La.App. 1 Cir. 9/19/97), 701 So.2d 236, 238; writ denied 97-3034, (La.2/13/98), 709 So.2d 750. Where the Court of Appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Turner v. D'Amico, supra.
*43 We have reviewed the record carefully and have determined that East Jefferson Hospital and Dr. Kennedy are equally at fault in causing the plaintiff's injury. Accordingly, we apportion fifty-percent of the fault to East Jefferson and fifty-percent of the fault to Dr. Kennedy, and we order the judgment amended to reflect such. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are assessed to defendant, East Jefferson Hospital.
AMENDED AND AS AMENDED, AFFIRMED.