COX, J.
| -| Adult children of the deceased, Cleveland Coward (“Coward”), filed suit against *238 a hospital, Richardson Medical Center (“RMC”), and later amended to include the treating emergency room physician, Dr. David Lifshutz (“Dr. Lifshutz”), alleging negligence and medical malpractice when their father died after being treated for several blows to the head with a steel pipe received during a fight. The plaintiffs, Letitia Hoston, et al. (“Hoston”), appeal from a partial summary judgment in favor of RMC which dismissed the negligence claims against the hospital but excepted any potential vicarious liability for the actions of Dr. Lifshutz in treating Coward. Pursuant to the trial court’s judgment of August 15, 2016, the trial court granted the motion for summary judgment dismissing all claims of the plaintiffs against RMC, except as to the vicarious liability of RMC regarding the emergency room doctor, David Lifshutz, which was still pending before a medical review panel. For the following reasons, we respectfully reverse the judgment of the trial court regarding the dismissal of RMC and remand for further proceedings.
FACTS
On May 28, 2011, at 8:30 p.m., Coward, a 66-year-old man, was admitted to RMC after having been involved in a fight with another man. In the course of the fight, Coward was struck in the head with a steel pipe approximately four times. Upon arrival at RMC, Dr. Lifshutz, the attending ER physician, examined Coward and ordered a CT scan of his head. Coward was treated for a laceration to his forehead and loss of consciousness before being taken for a CT scan at 4:21 p.m. While the CT images were sent to an off-site radiologist for evaluation, Coward underwent |2an alcohol screen that showed results of greater than 300 mg/dl.[1] At 6:15 p.m., Coward was discharged and was able to walk out of the emergency room in police custody.[2] Dr. Lifshutz testified at his deposition that Coward would not have been discharged without his permission. RMC records show that the radiologist’s report of findings from Coward’s CT scan was transmitted to RMC at 6:38 p.m., 23 minutes after Coward was discharged.
The radiologist’s findings from the CT report state that there was soft tissue swelling with scalp sutures on the left side of the frontoparietal area and pneumoce-phalus [3] with small collections of air along the right side of the cranial vault. The report notes that there was no evidence of acute traumatic intracranial brain injury, nor were there any visible skull fractures. The radiologist’s impression was of a normal brain with “no obvious acute intracra-nial brain injury,” although the report notes pneumocephalus with several droplets of air along the right side of the cranial vault. The report concludes with the statement “Urgent Finding: Pneumo-cephalus.”
The discharge instructions issued for Coward by RMC do not include any mention of the CT scan or follow-up procedures.[4] They instruct Coward to follow up *239 with his primary care physician in 7 days, to change dressings on the laceration every 24 hours, and to take Tylenol for pain as needed.
| aThe record indicates that neither Dr. Lifshutz nor any other RMC staff member communicated with Coward or the Rich-land Detention Center following receipt of the CT scan report. On June 1, 2011, police department personnel observed that Coward was “unaware of his surroundings” and “refused to walk.” He was transported to E.A. Conway Medical Center for evaluation and treatment. A CT scan performed at E.A. Conway Medical Center on June 1, 2011, showed Coward had sustained a skull fracture, subdural hematoma, and extensive pneumocephalus. By June 2, 2011, he had lapsed into a coma, and, after extensive treatment, he died on August 9, 2011. The autopsy report lists Coward’s cause of death as “Pneumonia Complicating Head Injury.”
Two separate medical malpractice panels were empanelled to render opinions on the plaintiffs’ claims. The first medical review panel rendered its opinion on May 13, 2014, and unanimously concluded that the RMC staff had met the applicable standard of care.[5] It also found that there was a material issue as to whether RMC was vicariously liable for any wrongdoing by Dr. Lifshutz but determined not to make a finding on that issue. The second medical review panel was tasked with determining the fault of Dr. Lifshutz. That panel has, according to Hoston’s brief, returned a conclusion that Dr. Lifshutz was negligent; however that opinion is not included in the record.
At his deposition, Dr. Lifshutz testified that, at the time of the incident, he was employed by Emergency Staffing Solutions. He went from one location to another performing emergency room services at various | ¿medical centers. When rendering services at the RMC emergency room, he was the only physician there to see patients, and he was solely responsible for determining the level of care given to a patient, Dr. Lifshutz stated that he did not think he gave the discharge instructions to the police, but his consent was required to discharge Coward. He stated that the results of the CT scan at RMC were markedly different than the results of the later CT scans. He could not recall when or how (i.e. orally by phone or as a physical document) he received the report from the radiologist after the RMC CT scan, but he believed he received the information before Coward left the hospital. This conclusion was based on his statement that he “would not have discharged him, released him to police custody, without knowing the results of the CT scan.” As a result of this conclusion, Dr. Lifshutz stated that he must have received a call from the radiologist about the report because he wrote down “no acute injury” on his chart. He also stated that sometimes physicians will indicate the basis of the information they include on the chart, but he did not do so in the case of the “no acute injury” note. He stated that the fact that he wrote the note down indicates that he would have had a basis for writing it. The phrase “no acute injury” was intended to mean no intracranial bleeding had occurred, no obvious fractures, and no swelling of the brain.
When examining the CT report from the radiologist during his deposition, Dr. Lif-shutz stated that a finding of pneumoce- *240 phalus does not solely indicate a skull fracture. Instead, pneumocephalus can occur when air comes in from the sinuses.[6] He concluded that the pneumocephalus did not IfiOccur from a fracture based on the CT report’s statement that there was not a skull fracture. Dr. Lifshutz stated that he did not, as a matter of practice, consult with the radiologist after receiving a report unless he had a question or disagreed with the findings. He, also stated that he had no criticism of the nurses who were working at the time he treated Coward. Dr. Lifshutz elaborated that he did not think the receipt time shown on the radiologist’s report was wrong, but that it was possible he received the report before the time shown on the report.
In response to RMC’s summary judgment motion and the first medical review panel’s opinion, Hoston submitted an affidavit from Dr. Richard Sobel, a board-certified emergency physician in Atlanta. Dr. Sobel stated that he had reviewed the medical review panel’s opinion, the various “position papers,” Dr. Lifshutz’s deposition, and all of Coward’s available medical records to include those produced by RMC. Dr. Sobel’s affidavit disagrees with the first medical review panel’s conclusion that the hospital was not directly negligent. The most relevant section of the affidavit states that Dr. Sobel is of the opinion that the standard of care and reasonable medical practice was not maintained when RMC failed to maintain “an adequate x-ray discrepancy process by which ‘urgent’ or critical findings reported by tele-radiology and not addressed by the emergency department physician are identified and addressed in an expeditious manner.” The affidavit also states that RMC fell below the standard of care by failing to “inform Richland Parish Detention Center of Mr. Coward’s abnormal CT findings and the need for appropriate medical re-assessment and possible interventions.” Dr. Sobel’s affidavit also identifies eighteen other instances where he believes “Richardson Medical Center and/or its agents and/or Dr. RDavid Lifshutz” failed to meet the required standard of care. The affidavit concludes that “some or all of these deviations,.. increased Mr. Coward’s risk of harm or substantially contributed to his demise on 8/9/11 within reasonable medical certainty.”
After a hearing on RMC’s motion for summary judgment, the trial court granted partial summary judgment with respect to the direct negligence claims against RMC, but denied the motion and kept RMC in the suit with respect to any potential finding of vicarious liability for the actions of Dr. Lifshutz. The judge provided oral reasons for his ruling, stating:
Plaintiff has argued that the hospital owed a duty to the patient to review the CAT Scan and to take necessary action to get him back to the hospital. The Court disagrees and feels that the doctor is the ultimate party that can make—is the only party that can make that decision. The—the staff cannot discharge or—well, not enroll—admit any patient, only a doctor can do that. And to put that kind of burden on nurses and the EMS, EMT people, is too burdensome, you know, by extensioning the hospital. For that reason I am granting the motion for summary judgment as to Richardson Medical Center except as to the possibility of a determination that it may be vicariously liable for any negligence on the part of Dr. [Lifshutz],
*241 Hoston appealed from the ruling only as to the partial grant of summary judgment. As such, the determination as to vicarious liability is not before us.
THE PARTIES’ POSITIONS
In their sole assignment of error, the plaintiffs urge the court erred in granting partial summary judgment, specifically in finding that RMC did not owe a duty to the patient to rbview the results of the CT scan and/or to take action to contact Rich-land Parish Detention Center about the CT scan results and the need for medical supervision. They contend that Louisiana courts have routinely found that hospitals owe a duty of care to patients that is ^independent of the duty of care owed by the treating physician. They cite to the Louisiana Supreme Court’s summary of a hospital’s duties in Sibley v. Board of Supervisors of LSU, 477 So.2d 1094 (La. 1985), for the proposition that, where there is expert testimony that hospital procedures were inadequate or that hospital staff breached a duty of care, summary judgment is improper. The plaintiffs also refer to Bossier v. DeSoto General Hospital, 442 So.2d 485, 490 (La. App. 2 Cir. 1983), writ denied, 443 So.2d 1122 (La. 1984), to assert that a hospital cannot claim to have discharged its obligation of care solely by following a treating physician’s orders; rather, a patient can expect a hospital’s staff to use its professional expertise and judgment to supplement a treating physician’s orders. As a result, strict adherence to a physician’s orders does not preclude a finding of negligence on the part of the hospital.
The plaintiffs argue that their case is analogous to Papania v. State through Board of Supervisors of LSU, 2012-0551 (La.App. 4 Cir. 1/9/13), 108 So.3d 256, in which a hospital was found to be negligent when it failed to follow up on an abnormal test result and failed to record the abnormal result in-records later reviewed by other doctors for treatment. They also cite Brown v. E.A. Conway Memorial Hospital, 588 So.2d 1295 (La. App. 2 Cir. 1991) and Hoffman v. East Jefferson General Hospital, 00-1216 (La.App. 5 Cir. 12/13/00), 778 So.2d 33, for the propositions that a physician is not solely responsible for treating a patient, and a hospital .and physician can be jointly negligent in the treatment of a patient. Plaintiffs contend that Dr. Sobel’s affidavit listed numerous breaches of the applicable standard of care for both the hospital and Dr. Lifshutz and that it was error to -grant summary I ¿judgment under the theory that Dr. Lif-shutz was solely responsible for Coward’s care.
RMC responds that , the plaintiffs’ only evidence submitted to defeat the motion for summary judgment was the “factually unsupported and conclusory affidavit of Dr. Sobel.” It asserts that Dr. -Sobéis statements on causation are conclusory and make no attempt to link the alleged breaches with the damages other than stating that “some or all of [the] deviations ... increased Mr. Coward’s risk of harm or substantially! contributed to his demise.” On a summary judgment motion in a medical malpractice case, a party must provide some evidence to establish causation, and the burden cannot be satisfied by the presentation of unsupported or conclu-sory statements in an affidavit. Lee v. McGovern, 49,953 (La.App. 2 Cir. 7/1/15), 169 So.3d 814; Foster v. Patwardhan, 48,575 (La.App. 2 Cir. 1/22/14), 132 So.3d 495, writ denied, 138 So.3d 1233 (La. 4/25/14). RMC also argues that Dr. Sobéis affidavit is contrary to the facts in the record, particularly pointing to Dr. Lifshutz’s deposition testimony as proof that he knew the CT results before discharging Coward, and stating that nothing in the record contradicts that statement. It argues that, as *242 a result, any hospital procedures are irrelevant because the CT results were known to Dr. Lifshutz. RMC concedes that hospitals can be independently liable, but argues that they cannot be held liable for the discharge of patients.
DISCUSSION
La. Civ. Code art. 2315 provides that “every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” Further, La. Civ. Code art. 2316 provides that every person is responsible not only for damages caused by his acts, but also for his ^negligence, and La. Civ. Code arts. 2317 and 2370 extend that responsibility to acts done by those for whom a person is answerable and for the acts of employees undertaken in the course of their employment.
The Louisiana Supreme Court has recognized the application of these principles in establishing duties of care for hospitals in various circumstances. In Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La. 1974), the Louisiana Supreme Court announced:
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may require. It is the hospital’s duty to protect a patient from dangers that may result from the patient’s physical and mental incapacities as well as from external circumstances peculiarly within the hospital’s control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.
It again recognized that principle along with various other duties in Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, 1099 (La.1985), and explained that a breach of a duty which causes injury to a patient or other person may constitute independent negligence by a hospital’s governing board, resulting in the hospital’s liability even in the absence of any finding of negligent conduct by an employee. As a result, it is clear that, in order to establish a negligence claim against a hospital, the plaintiff must prove, by a preponderance of the evidence, (1) a duty of care owed by the defendant, (2) a breach of that duty, and (3) a causal connection between the breach and the resulting injury. Expert testimony is generally needed to establish the applicable standard of care and whether the standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Samaha v. Rau, 2007-1726 (La. 2/26/08), 977 So.2d 880; Pfiffner v. Correa, 1994-0924, 1994-0963, 1994-0992 (La. 10/17/94), 643 So.2d 1228.
A de novo standard of review is required when an appellate court considers rulings on summary judgment motions, and the appellate court must use the same criteria that governed the district court’s determination of whether summary judgment was appropriate. Bank of New York Mellon v. Smith, 15-0530 (La. 10/14/15), 180 So.3d 1238, 1243. A court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law, pursuant to La. C.C.P. art. 966. See Catahoula Parish Sch. Bd. v. Louisiana Machinery Rentals, LLC, 12-2504 (La. 10/15/2013), 124 So.3d 1065, 1071. To be considered, an expert’s opinion must be more than a conclusory assertion about legal issues. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La. 2/29/00), 755 So.2d 226; Dumas v. Angus Chemical Co., *243 31,969 (La.App. 2 Cir. 8/20/99), 742 So.2d 655, writ not cons., 751 So.2d 237 (La. 11/5/99).
The burden of proof for a summary judgment motion remains with the movant. However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the nonmoving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment should be granted. See La. C.C.P. art. 966(D)(1).
lnOn de novo review of this record, we find that there are genuine issues of material fact that render summary judgment under La. C.C.P. art. 966 A(3) improper at this time. Although the trial court’s oral reasons for granting summary judgment appear to find that the hospital had no duty to the patient to review the CT scan, RMC’s brief concedes that it did owe a duty of some sort to Coward. In addition, the Louisiana Supreme Court’s opinions in Hunt and Sibley, supra, multiple cases from the circuit courts, and the opinion of the first medical review panel make clear that a hospital owes a duty of care to its patients. Dr. Sobel’s affidavit purports to identify the specific duty owed by the hospital to have a procedure to review the CT scan results and to inform those holding Coward in custody of the need for medical assessment and care. Dr. Sobel’s affidavit also constitutes evidence pointing to a breach of the duty owed by RMC. In contrast, the first medical review panel’s opinion found that there was no breach of the duty of care by RMC. The differing opinions in the record establish a genuine issue as to the breach of the duty of care.
RMC points to causation as the essential element of the plaintiffs’ claim that is not supported by evidence because Dr. Sobel’s affidavit is conclusory and unsupported. As an initial matter, Dr. Sobel’s affidavit identifies the numerous medical records and opinions that were reviewed before authoring his opinion. The opinion then goes on to provide a detailed summary of Coward’s treatment and Dr. So-bel’s own impression of the care rendered and the results of the CT exam. He then lists twenty alleged breaches of the standard of care and concludes that those deviations “increased Mr. Coward’s risk of harm or substantially contributed to his demise.” Although RMC claims this explanation of causation is less than | ^detailed, it should be noted that, as in Lee v. McGovern, supra, cited by RMC, the standard for causation requires either expert testimony or the relationship between the breach and the injury to be “so obvious that a lay person can infer” causation. In Lee v. McGovern, this court affirmed a grant of summary judgment because an expert affidavit merely concluded that lower digestive tract problems “caused or contributed to” the victim’s untimely death, and the connection between the digestive tract problems and the heart attack that the victim suffered was not obvious to a lay person. In contrast, in the present case, the victim’s death certificate lists the very injury he was being treated for as a complicating factor in his death, stating “Pneumonia Complicating Head Injury,” and all of the medical records for Coward’s treatment following his visit to RMC involve later effects of the injury he suffered. It is, therefore, obvious to a lay person that there may be some causal connection between Coward’s death and the treatment and care that he received *244 from RMC and Dr. Lifshutz. Even if Dr. Sobel’s statement of causation is insufficient, his affidavit along with all of the other medical records creates a genuine issue of material fact regarding causation.
Turning to RMC’s argument that it is uncontroverted that Dr. Lifshutz knew the results of the CT scan before discharging Coward, we are unconvinced. Dr. Lifshutz’s deposition testimony that RMC points to is not based on an independent recollection of a telephone call or other mánner of receiving the test results; rather it is based on Dr. Lifshutz’s own deduction that, if he discharged Coward, he would have first known about the test results. Even if we were to accept Dr. Lifshutz’s testimony as to when the CT results were received, it is directly controverted by RMC’s medical records which show that the test results were not received until after Coward |iawas discharged. There is a very clear dispute regarding when Dr. Lifshutz knew of the results of the CT scan, and the hospital’s procedures in handling the results are certainly relevant to that dispute.[7]
The, record in this case demonstrates that there are issues of material fact as to elements of the plaintiffs’ claim, including the issue of causation. As a result, summary judgment in this case was improper as, there are genuine issues of material fact.
CONCLUSION
For the reasons expressed, we respectfully reverse the granting of partial summary-judgment for negligence on the part of RMC, and remand to the court for further proceedings. This ruling does not affect the . trial court’s denial of the summary judgment motion as to the potential vicarious liability of Richardson Medical Center. Costs of this proceeding are- assessed to the appellee, Richardson Medical Center, in the amount of $3,140.00, in accordance with La. R.S. 13:5112.
REVERSED AND REMANDED.

. Dr. Lifshutz testified in his deposition that a person is considered to be intoxicated at levels of 80 mg/dl and higher.

. Coward was discharged into police custody and transported to the Richland Parish Detention Center in connection with the fight that caused his injuries.

. Dr. Lifshutz described pneumocephalus as a condition where bubbles of air or gas are found within the cranial cavity.

. The discharge instruction form included a blank that could be checked underneath a caption reading "Head Injury,” and followed • by instructions to report to a doctor if certain symptoms occurred. Although other blanks *239 for wound care were checked off, the blank for head injuries was not marked.

. It should be noted that the amended petition which added the claims against Dr. Lif-shutz was not approved by the district court until May 18, 2016.

, The CT scan and report from E.A. Conway describe a fracture that involves the sphenoid, one of the sinuses in a person’s brain.

. We would note that while much effort has • been expended by the parties in asserting ’ what RMC’s procedures should or should not have included, there is very little in the record that describes what the procedures actually are,